UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )
United States of America,           ) File No. 16-CR-265
                                    )          (RHK/HB)
          Plaintiff,                )
                                    )
vs.                                 ) St. Paul, Minnesota
                                    ) December 5, 2016
(1) Momodu Babu Sesay,              ) 11:07 a.m.
(2) Fester Sayonkon,                )
(3) Picasso Joseph Dejoachim,       )
(4) Mohammed Kromah, and            )
(6) Saddam Samaan Daoud Samaan,     )
                                    )
          Defendants.               )
                                    )
------------------------------------------------------------


BEFORE THE HONORABLE HILDY BOWBEER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


**(MOTIONS HEARING)**


Proceedings recorded by mechanical stenography;
transcript produced by computer.


LORI A. SIMPSON, RMR-CRR
(651) 848-1225

```
 1    APPEARANCES

 2      For the Plaintiff:        U.S. Attorney's Office
                                  AMBER M. BRENNAN, AUSA
 3                                600 U.S. Courthouse
                                  300 South Fourth Street
 4                                Minneapolis, Minnesota 55415

 5      For Defendant Sesay:      CAROLINE DURHAM, ESQ.
                                  Suite 2626
 6                                101 East Fifth Street
                                  St. Paul, Minnesota 55101
 7
        For Defendant Sayonkon:   Wold Morrison Law
 8                                AARON J. MORRISON, ESQ.
                                  247 Third Avenue South
 9                                Minneapolis, Minnesota 55415

10      For Defendant Dejoachim:  Le Law Group
                                  DANIEL S. LE, ESQ.
11                                Suite 415
                                  333 Washington Avenue North
12                                Minneapolis, Minnesota 55401

13      For Defendant Kromah:     Kenneth Ubong Udoibok, PA
                                  KENNETH U. UDOIBOK, ESQ.
14                                Suite 5010
                                  310 Fourth Avenue South
15                                Minneapolis, Minnesota 55415

16      For Defendant Samaan:     Wolf Law Office
                                  GARY R. WOLF, ESQ.
17                                246 Third Avenue South
                                  Minneapolis, Minnesota 55415
18
        Court Reporter:           LORI A. SIMPSON, RMR-CRR
19                                Suite 146
                                  316 North Robert Street
20                                St. Paul, Minnesota 55101

21

22

23

24

25
```

1                      **I N D E X**

                                                          PAGE

2    MICHAEL OLSON
        Direct Examination by Ms. Brennan                    26
3        Cross Examination by Ms. Durham                     44
        Cross Examination by Mr. Udoibok                     48
4        Cross Examination by Mr. Le                         55
        Redirect Examination by Ms. Brennan                 62
5
     COLLEEN BELTRAN
6        Direct Examination by Ms. Brennan                   65
        Cross Examination by Mr. Morrison                    70
7
     MICHAEL PETERSON
8        Direct Examination by Ms. Brennan                   72
        Cross Examination by Mr. Morrison                    82
9        Redirect Examination by Ms. Brennan                90

10   PAUL BONESTEEL
        Direct Examination by Ms. Brennan                    91
11       Cross Examination by Mr. Wolf                      101
        Redirect Examination by Ms. Brennan                116

12

13

     GOVERNMENT'S EXHIBITS                                 REC'D
14       1                                                   24
        2                                                    24
15       3                                                   24
        4                                                    24
16       5                                                   24
        6                                                    24
17       7                                                   24
        8                                                    24
18       9                                                   24
        10                                                   24
19       11                                                  24
        12                                                   24
20       13                                                  24
        14                                                   24
21       15                                                  24
        16                                                   24
22       17                                                  24
        18                                                   24
23       19                                                  24
        20                                                   24
24       21                                                  24
        22                                                   43
25

1  **P R O C E E D I N G S**

2  **IN OPEN COURT**

3  (Defendants present)

4  THE COURT:  We are in court this morning on a

5  number of motions in connection with the matter of the

6  United States of America vs. Sesay, Sayonkon, Dejoachim,

7  Kromah, and Samaan.  This is criminal matter number 16-265.

8  Before I get into the agenda for the morning, let

9  me first ask for appearances.  First on behalf of the United

10  States?

11  MS. BRENNAN:  Good morning, Your Honor.  Amber

12  Brennan appearing on behalf of the United States.  And

13  seated next to me is Special Agent Randall Flint from the

14  Secret Service.  He's the case agent.

15  THE COURT:  All right.  Good morning.

16  And on behalf of the defendants, starting with

17  Mr. Sesay?

18  MS. DURHAM:  Good morning, Your Honor.  Caroline

19  Durham on behalf of Mr. Sesay, who is to my right at counsel

20  table.

21  THE COURT:  Okay.  Good morning.

22  MR. MORRISON:  Good morning, Your Honor.  Aaron

23  Morrison appearing on behalf of Mr. Sayonkon, who is present

24  and to my right.

25  THE COURT:  Good morning to you.

1            MR. LE:  Good morning, Your Honor.  Daniel Le --

2    that's spelled L-e -- appearing on behalf of Mr. Dejoachim,

3    who appears seated at my left.

4            THE COURT:  Good morning.

5            MR. WOLF:  Good morning, Your Honor.  Gary Wolf on

6    behalf of Mr. Samaan, who is present.  He is seated to my

7    right.  He's number 6 on the indictment, Your Honor.

8            MR. UDOIBOK:  Good morning, Your Honor.  Kenneth

9    Udoibok on behalf of Mohammed Kromah --

10           THE COURT:  Thank you.

11           MR. UDOIBOK:  -- who is seated on my right.

12           THE COURT:  Thank you.  Good morning to all of

13   you.

14           We've got a number of motions on for this morning,

15   some nondispositive and some dispositive.  Let me go through

16   what I have on the agenda and you can let me know whether I

17   have missed anything or whether I have included something

18   that one or the other party wishes to withdraw.

19           First, with respect to Mr. Sesay I have Docket

20   No. 73, motion for suppression of an unlawful search; Docket

21   No. 74, motion for suppression of statements; 75, motion for

22   retention of rough notes; 76, motion for disclosure of grand

23   jury transcripts; 77, motion for disclosure of Brady

24   material; 78, motion for 404(b) evidence; 79, motion for

25   expert disclosures; 80, motion for disclosure of informants;

1   72 -- they're a bit out of -- I'm not sure if I've got the

2   docket number correct here, but I've got a motion to compel

3   attorney for the government to disclose evidence favorable

4   to the defendant.  I've got a motion for discovery of expert

5   under Rule 16(a)(1)(G) and a motion for discovery and

6   inspection.

7          So with respect to those -- first let me ask,

8   Ms. Durham, whether I've missed any of Mr. Sesay's motions

9   or included something that wasn't intended.

10          MS. DURHAM:  No, Your Honor.

11          THE COURT:  All right.  And I should have said

12   with respect to all of these I also have as a nondispositive

13   motion government's motion for discovery, Docket No. 47, and

14   that applies in all cases.

15          Ms. Durham, of these I see the motion for

16   suppression of an unlawful search and the motion for

17   suppression of statements as dispositive.  It appears to me

18   that the rest are nondispositive.  Any disagreement there?

19          MS. DURHAM:  I agree.

20          THE COURT:  And with respect to any of the

21   nondispositive motions, do you have anything that you wanted

22   to add by way of oral argument or other clarification at

23   this hearing at this time?

24          MS. DURHAM:  The only piece I would raise, Your

25   Honor, is with regard to the expert disclosures.  The

1    government in their reply brief has asked that the Court's

2    order with regard to those allow them to provide that

3    information 14 days before trial and I would submit that a

4    case that has been investigated for four or five years, we

5    should be entitled to expert disclosures 14 days from

6    today's date.

7              Other than that, with regard to the nondispositive

8    I have nothing further to add.

9              THE COURT:  All right.  Ms. Brennan, do you want

10   to address the issue -- or do you have anything to add with

11   respect to any of the nondispositive motions and in

12   particular do you want to address the argument with respect

13   to expert disclosures?

14             MS. BRENNAN:  Thank you, Your Honor.  The only

15   thing I would say with respect to the expert disclosures,

16   first of all, we don't currently have a trial date yet in

17   this case.  As I'm sure the Court is aware, we will have

18   some subsequent briefing to follow today's hearing and I'm

19   expecting the trial to be set in perhaps February at the

20   earliest given the timeline that's going to be needed for

21   briefing and a decision on some of the substantive motions

22   in the case.

23             At this time the government doesn't have any

24   expert witnesses that it intends to call at trial.  That's

25   not to say that as we prepare for trial we wouldn't

1      potentially decide that we did need an expert witness.

2              So I think there's really no reason to require us

3      to disclose an expert witness 14 days from today's date.  If

4      the defendants think that they're going to need more than

5      14 days ahead of trial, we would agree to disclose those

6      30 days ahead of trial.

7              THE COURT:  All right.  Ms. Durham?

8              MS. DURHAM:  Thank you, Your Honor.

9              THE COURT:  Anything further?

10             MS. DURHAM:  Not with regard to the

11     nondispositive, but might I -- with regard to our motion to

12     suppress the searches, as noted in the paperwork, it's

13     anticipated that that's a four-corners.  We're simply

14     submitting those.  Ours would be Government's Exhibits 3, 4,

15     5, 6, and 7, those warrants that they're going to offer that

16     goes to our motion with regard to the search, and I would

17     simply stand on the record of the four corners of the

18     search.

19             I believe there's testimony with regard to the

20     statements and we'll have a few questions for the officer,

21     but that's all we need.

22             THE COURT:  Okay.  I guess my concern on -- and

23     this is true, really, with respect to all of the motions

24     relating to search warrants.  There were probably 20 search

25     warrants here and I'm concerned about kind of a four-corners

1    review with nothing specifically identified as a challenge.

2    I'm certainly willing to allow some -- a brief additional

3    time for briefing to identify specific issues with the

4    search warrants.

5             MS. DURHAM:  On behalf of Mr. Sesay, Your Honor,

6    to be perfectly frank with the Court, it's an issue of

7    whether the Court in reviewing it finds probable cause.  We,

8    in fact, will not be asking for briefing.

9             THE COURT:  All right.

10            MS. DURHAM:  So it's nothing beyond the four

11   corners and was there sufficient probable cause in the

12   affidavit to justify the different searches that were

13   conducted by law enforcement in this case.

14            THE COURT:  All right.

15            MS. DURHAM:  I don't want to speak for my

16   colleagues, they may have issues to brief, but just in terms

17   of Mr. Sesay, we will not be asking for briefing.

18            THE COURT:  Very well.  With respect to the motion

19   for suppression of statements, do you have anything to add

20   by way of providing some greater specificity to those so

21   that Ms. Brennan can have that in mind and I can have that

22   in mind as we listen to the witnesses?

23            MS. DURHAM:  What I would anticipate you would see

24   and was proffered in the government's reply, the

25   government's position was Mr. Sesay was not in custody.

1    We're going to ask a few questions that I think will flesh

2    out that an average person would believe that they are in

3    custody and so Miranda should have been given.

4              THE COURT:  All right.

5              MS. DURHAM:  Other than that, we have no

6    challenges to the statements.

7              THE COURT:  All right.  Thank you.

8              Anything else with respect from either of you --

9    Ms. Brennan, I'll give you a chance.  Anything else with

10   respect to Mr. Sesay's motions prior to moving on in a few

11   minutes to the testimony?

12             MS. BRENNAN:  No, Your Honor.  Thank you.

13             THE COURT:  All right.  Thank you very much.

14             With respect to Mr. Sayonkon I have Docket

15   No. 110, the motion for disclosure of Rule 404(b) evidence;

16   111, motion to compel attorney for the government to

17   immediately disclose Brady and Giglio evidence; 112, motion

18   to retain agents' notes; 113, motion for disclosure pursuant

19   to Rule 16; 114, motion to suppress search and seizure of a

20   1998 BMW 740iL; 115, motion to suppress search and seizure

21   of a computer; 116, motion to suppress search and seizure at

22   the Gateway Commons apartment; 117, motion to suppress

23   tracking device monitoring; and 118, motion to suppress

24   search and seizure of residence and attached garage.  Of

25   those it appears to me that 114 through 118 inclusive are

1    the dispositive motions, the others being nondispositive.

2            Let me ask, Mr. Morrison, whether you have

3    anything to add.  First let's talk about the nondispositive

4    motions.

5            MR. MORRISON:  Nothing additional, Your Honor.

6            THE COURT:  All right.  Ms. Brennan, anything to

7    add to the briefing I've already got with respect to the

8    nondispositive motions brought by Mr. Sayonkon?

9            MS. BRENNAN:  No, Your Honor.

10           THE COURT:  With respect to the dispositive

11   motions, Mr. Morrison, anything to add by way of additional

12   specifics that would help either Ms. Brennan or me or both

13   as we proceed with the testimony?

14           MR. MORRISON:  Yes, Your Honor.  On defendant's

15   motion to suppress the Gateway Commons apartment, Docket

16   No. 116, we do anticipate receiving some testimony today on

17   that motion.  Specifically, there was no warrant for the

18   search of the apartment.  And as far as I can tell from the

19   police reports, there was no consent given by either

20   Mr. Sayonkon or the gentleman whose name was on the lease.

21           So we are moving for suppression of all the

22   evidence that was seized during that search and that would

23   relate, then, to Mr. Sayonkon's motion to suppress a search

24   of a computer, Docket 115.  That computer, I believe, was

25   the computer that was seized during the search of the

1     Gateway Commons apartment, so obviously my motion would be

2     that that search was illegal.

3              As far as the remaining searches, depending on how

4     testimony came in on the Gateway Commons search, I perhaps

5     would ask for an opportunity to supplement the four-corners

6     motion for 114, 117, and 118, but I don't anticipate

7     additional testimony or probably additional argument beyond

8     preserving the issue on a four-corners analysis.

9              THE COURT:  All right.  Ms. Brennan, anything

10    further with respect to those at this time?

11             MS. BRENNAN:  Your Honor, I think that

12    Mr. Morrison and I agree with respect to the Gateway Commons

13    apartment search and then the computer -- the search of the

14    computer that was obtained from the apartment.  We will have

15    testimony today regarding the circumstances of officers

16    entering that Gateway Commons apartment.  I would agree with

17    Mr. Morrison that if that was an unlawful action, that the

18    search of the computer that was obtained would be fruit of

19    the poisonous tree, so to speak.

20             THE COURT:  All right.

21             MS. BRENNAN:  And so I think that that is one

22    issue that Mr. Morrison and I would probably both like to be

23    able to brief after today's hearing.

24             THE COURT:  And certainly with respect to the

25    motions to suppress on which testimony is taken or other

1    evidence proffered in the course of this hearing, we'll be

2    setting a schedule for post-hearing briefing.

3              MR. MORRISON:  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Let's move on to Mr. Dejoachim.  Mr. Le, I've got

6    Docket No. 83, defendant's motion for disclosure of Brady

7    material; 84, motion for suppression of statements; 85,

8    motion for suppression of unlawful search; 86, motion for

9    404(b) evidence; 87, motion to compel the attorney for the

10   government to disclose evidence favorable to the defendant;

11   88, motion for disclosure of informants; 89, motion for

12   expert disclosures; 90, motion for early disclosure of

13   Jencks Act material; and 91, motion for disclosure of grand

14   jury transcripts.  Of those it appears that 84 and 85 are

15   dispositive motions, the rest being nondispositive.

16             So I will ask you first on the nondispositive

17   motions, anything you want to add or supplement by way of

18   oral argument?

19             MR. LE:  Nothing beyond what's been discussed

20   already with regards to the expert disclosures and the

21   timing of those disclosures, Your Honor.  We would be in

22   agreement with what has been discussed on the record.

23             THE COURT:  All right.  Ms. Brennan, anything

24   further on the nondispositive motions?  I will incorporate

25   by reference your comments with respect to the expert

1   disclosures previously.

2           MS. BRENNAN:  Nothing more than that, Your Honor.

3           THE COURT:  All right.  Moving on to No. 84 and

4   85, the dispositive motions, Mr. Le, anything to add by way

5   of some greater specificity on those?

6           MR. LE:  Yes, Your Honor.  With regards to our

7   challenges to the search warrant and therefore suppression

8   of the poisonous fruit thereof, we would be seeking a brief

9   briefing schedule after.  We would be challenging it

10  primarily upon probable cause and additionally on

11  misrepresentation.  I see from the government's Notice of

12  Intent to Call Witnesses today, with respect to the second

13  witness listed, Randall Flint, Special Agent Flint, that it

14  pertains to statements prior to obtaining a search warrant.

15          And so therefore I only bring that up for the fact

16  that it was my understanding that we would just be

17  proceeding based upon the four corners of the search warrant

18  documents.  But is there going to be testimony from him on

19  any search warrant materials?

20          THE COURT:  Make sure that even when you are

21  directing a question to Ms. Brennan, that you're speaking

22  loudly enough that we can catch it for the record.

23          MR. LE:  I'm just asking Ms. Brennan to clarify

24  with respect to the testimony of that particular listed

25  witness what the substance will be.

1          MS. BRENNAN:  Your Honor, the government disclosed

2     Special Agent Randall Flint as a potential witness in this

3     case today to testify regarding the statement that was taken

4     from Mr. Dejoachim and then separately the circumstances

5     surrounding the search of a computer, which is the subject

6     of Mr. Morrison's motion for suppression of that search

7     warrant evidence.  That does not relate to Mr. Dejoachim.

8          THE COURT:  All right.  Thank you very much for

9     the clarification.

10          Anything else, then, with respect to

11     Mr. Dejoachim's motions?

12          MR. LE:  Your Honor, we do anticipate testimony,

13     then, on the suppression of statements motion before the

14     Court, which is the second dispositive motion.

15          THE COURT:  And can you provide a little

16     additional understanding of the basis on which you expect to

17     challenge those statements?

18          MR. LE:  Yes, Your Honor.  The statement was

19     initiated by the government.  My client was a prisoner in a

20     secure correctional facility at the time when these were

21     initiated.

22          We are -- our position is that these statements

23     were taken in violation of his Fifth and Sixth Amendment

24     rights because it did pertain to -- the timing of it

25     pertains to a critical stage with regards to this case that

1    we are here for.

2              THE COURT:  All right.  Very well.

3              Ms. Brennan, anything further with respect to

4    Mr. Dejoachim's motions before we move on to the testimony

5    phase?

6              MS. BRENNAN:  No, Your Honor.

7              THE COURT:  All right.  Thank you.

8              Counsel for Mr. Kromah.

9              MR. UDOIBOK:  Good morning, Your Honor.

10             THE COURT:  Good morning.  I have Docket No. 93,

11   motion for disclosure of 404(b) evidence; 94, motion for

12   disclosure of expert witness; 95, motion for disclosure of

13   grand jury transcripts; 96, motion for disclosure of

14   informants; 97, motion for discovery pursuant to 18 U.S.C.

15   Section 3500, in other words, Jencks Act; 98, motion for

16   disclosure of Brady material; 99, motion for retention of

17   rough notes; 100, motion for suppression of statements; 101,

18   motion for suppression of unlawful search.  And that is the

19   list with respect to Mr. Kromah.  So it looks like 100 and

20   101 are the dispositive motions today.

21             With respect to the nondispositive motions,

22   anything further that you wanted to add now that we are

23   gathered here?

24             MR. UDOIBOK:  No, Your Honor.

25             THE COURT:  All right.  And, Ms. Brennan, I assume

1   nothing more to add from the government's perspective beyond

2   what's in your brief?

3           MS. BRENNAN:  That's right.  Thank you, Your

4   Honor.

5           THE COURT:  All right.  On the dispositive

6   motions, Mr. Udoibok, do you have -- can you provide

7   anything further with respect to either the motion for

8   suppression of statements or the motion for unlawful search

9   that would help us focus our proceeding today?

10          MR. UDOIBOK:  Your Honor, regarding suppression of

11  statements, we believe that there may have been a custodial

12  interview or interrogation.  It started outside of the

13  police department and ended up either in the police

14  department or someplace else, but nonetheless, we believe

15  that those statements were acquired unconstitutionally.

16          I don't anticipate that we'll need any briefing.

17  I've reviewed the government's recent brief regarding these

18  motions, but I don't anticipate that will require any

19  additional briefing.

20          If the Court reviews the search warrant -- the

21  four corners of the search warrant and finds probable cause,

22  then we will rely on that.  If the Court does not find

23  probable cause, then it would address the statements issue

24  with us.

25          THE COURT:  I need to make sure I'm understanding

1    here because we're not going to do any post-hearing briefing

2    in phases.  Essentially if it isn't addressed in the brief,

3    I consider it waived.

4            And so I want to think a little bit about all of

5    the four-corners review, but setting that aside, with

6    respect to the motions for any motion -- with respect to

7    briefing based on anything that happens here today, if it's

8    not addressed in the brief, I'm not going to address it in

9    my order.

10           So are you saying that you are going to want time

11   for briefing on the motion for suppression of statements?

12           MR. UDOIBOK:  Yes.

13           THE COURT:  All right.  But then you are saying

14   that with respect to the motion for suppression of unlawful

15   search, you'd like to be able to submit that just for

16   review -- just for a four-corners review without further

17   briefing?

18           MR. UDOIBOK:  Yes, Your Honor.  And I was also

19   saying what happens -- it's sort of related in my mind.

20   What happens to that influences the interview that occurred

21   subsequent to that meeting.

22           THE COURT:  But what you are saying is your

23   post-hearing brief will address all of that to the extent it

24   relates to the statements?

25           MR. UDOIBOK:  Yes.

1          THE COURT:  All right.

2          MR. UDOIBOK:  Sort of confusing.  I'm sorry.

3          THE COURT:  I think I'm following.  Thank you.

4          And finally, Mr. Samaan.  Mr. Wolf, yes.

5          MR. WOLF:  Good morning again, Your Honor.

6          THE COURT:  Good morning.  We have No. 119, motion

7     to disclose evidence favorable to the defense; 120, motion

8     for discovery and inspection; 121, motion to suppress

9     evidence; 122, motion to sever; 123, motion for disclosure

10    of statements of co-defendants; 124, motion for disclosure

11    of Giglio material; 125, motion to retain rough notes; 126,

12    motion for disclosure of Jencks Act material; 127, motion to

13    suppress statements, answers, or admissions; 128, motion to

14    disclose statements and reports of witnesses at the motions

15    hearing; 131, motion to disclose information about expert

16    witnesses; 132, motion for disclosure of Rule 404(b)

17    material; and 135, motion for disclosure of informants.

18          So I've got 121 and 127 as motions to suppress

19    that I'll treat as dispositive motions for purposes of

20    preparing an R&R.  I'll get back to those in a moment.

21          With respect to the motion to sever, I have not

22    checked with Judge Kyle here.  It would be my sense the

23    motion to sever would be better directed to the trial judge.

24          MR. WOLF:  I agree, Your Honor.

25          THE COURT:  So I'm going to have you take that up

1  with Judge Kyle's chambers and talk with chambers and

2  obviously with Ms. Brennan about whether oral argument ought

3  to be scheduled separately on that.

4          MR. WOLF:  Yes, Your Honor.  Thank you.

5          THE COURT:  Okay.  With respect to the

6  nondispositive motions, anything to add to what's already in

7  the briefing?

8          MR. WOLF:  As to 131, I think 30 days -- as far as

9  disclosure of experts information, 30 days is probably

10  sufficient, but if the defense has to go out and find

11  experts, we might be in a position of asking for a

12  continuance.  That's all I would add on the nondispositive

13  motions, Your Honor.

14          THE COURT:  All right.  Ms. Brennan, anything else

15  to add on the nondispositive motions?

16          MS. BRENNAN:  On the nondispositives, Your Honor,

17  it's my understanding that Mr. Wolf did file a motion to

18  withdraw ECF Docket No. 128, and that was the motion to

19  disclose identity of informants and --

20          MR. WOLF:  I did.

21          MS. BRENNAN:  -- all records concerning

22  informants.  And then there's a new motion for disclosure of

23  informants, a modified motion filed by Mr. Wolf, which is

24  ECF Docket No. 135.

25          MR. WOLF:  Correct.

1      THE COURT:  So 128 has been withdrawn, but 135 is

2    still alive and well?

3      MR. WOLF:  Yes, Your Honor.  And Your Honor read

4    the motions right in order that I listed them on my cover

5    letter when I submitted my two copies to chambers.

6      THE COURT:  All right.  Very well.  Thank you for

7    that clarification.

8      MR. WOLF:  Yes, Your Honor.

9      THE COURT:  With respect to Nos. 121 and 127,

10   anything that you can provide that will help us focus the

11   proceedings today, Mr. Wolf?

12     MR. WOLF:  Your Honor, I think that's the only

13   motion that we will have testimony on with respect to

14   Mr. Samaan.

15     What we're basically saying there is, you know,

16   once the police, our position is, violated his

17   constitutional rights by inspecting the hotel registry

18   records, everything that then flowed from that will be

19   suppressed and I've filed an eight-page memorandum in that

20   regard.  And that would include any statements that were

21   made on that date when Officer Bonesteel detained and seized

22   Mr. Samaan at the scene.

23     THE COURT:  Okay.  Ms. Brennan, anything to add?

24     MS. BRENNAN:  Yes, Your Honor.  As I stated in the

25   government's memorandum, I just want to make sure to clarify

1    that my understanding from Mr. Wolf is that in Document

2    No. 127, which is his motion to suppress Mr. Samaan's

3    statements, that what he is specifically referring to there,

4    because there are multiple statements that could be the

5    subject of that motion, that what he is referring to there

6    is the statement that was taken by Officer Bonesteel on the

7    day in question subsequent to the officer's obtaining of the

8    hotel registry.  So the motion to suppress statements hinges

9    on the lawfulness of the officer obtaining that hotel

10   registry.

11        THE COURT:  Mr. Wolf, is that a fair

12   characterization?

13        MR. WOLF:  Yes, Your Honor.  I mean, that's

14   further clarification and that is our position.  Of course,

15   if the start of the investigation is unconstitutional, then

16   subsequent statements, even though Mirandized and recorded,

17   would be suppressed under Wong Sun.

18        THE COURT:  While we're talking specifically about

19   a statement given to Officer Bonesteel, are there other

20   statements that you have in mind that you're arguing ought

21   to be suppressed?

22        MR. WOLF:  Independently of 121, no.  Subsequent

23   statements were Mirandized, recorded, what have you.  They

24   were not involuntary.  However, we believe if the Court

25   grants our motion under 121, all that followed would be

1    suppressed as fruit of the poisonous tree.

2              That's all, Your Honor.

3              THE COURT:  Ms. Brennan, does that give you enough

4    to go on or are you seeking further clarification?

5              MS. BRENNAN:  I think that gives me enough to go

6    on for now, Your Honor.  Thank you.

7              THE COURT:  All right.

8              MR. WOLF:  And as far as briefing, Your Honor, I

9    filed an eight-pager, but I suppose we would like some more

10   latitude to file post-hearing briefs on the issue in

11   defense -- or docket entry 121.  Thank you, Judge.

12             THE COURT:  Thank you.  Very well.

13             I think we can go on now, Ms. Brennan, to calling

14   your first witness.  How many witnesses do you anticipate

15   calling and any change to what you had anticipated before

16   the hearing?  I'll let you chat with the officer.

17             MS. BRENNAN:  Yes, Your Honor.  Maybe as a

18   preliminary matter I can just run through what I intend to

19   present.

20             THE COURT:  All right.

21             MS. BRENNAN:  First of all, I have a binder for

22   the Court of all of the government's exhibits.  They're in

23   the binder in hard copy.  And I also have a disk of those

24   exhibits and a list that I can provide to the Court.

25             What I would like to do is offer at this time

1    Exhibits Number 1 through 21.  I have a total of 22

2    exhibits.  Exhibit Number 22 will be offered through

3    testimony of a witness.  But Exhibits Number 1 through 21

4    are all search warrants in this case.  They're already, you

5    know, filed with the Court in their respective MJ case

6    numbers.  And I don't believe any of the defendants are

7    objecting to the admissibility of these search warrants.

8              THE COURT:  Is there any objection?

9              MS. DURHAM:  No objection.

10             MR. MORRISON:  No objection.

11             MR. LE:  No objection, Your Honor.

12             MR. WOLF:  No objection from Mr. Samaan, Your

13   Honor.

14             MR. UDOIBOK:  No objection for Kromah.

15             THE COURT:  All right.  Thank you.  Exhibits 1

16   through 21 inclusive will be received.  And then I assume

17   with respect to Exhibit 22, you'll offer that as it arises

18   in the course of testimony?

19             MS. BRENNAN:  That's correct, Your Honor.  So if I

20   may approach?

21             THE COURT:  Yes.  Thank you.

22        (Documents handed to the Court)

23             MS. BRENNAN:  Your Honor, the first -- the

24   government intends to call four witnesses.  Special Agent

25   Mike Olson from the Secret Service will testify about the

 1    statements that were obtained from Mr. Sesay, Mr. Kromah,

 2    and Mr. Dejoachim.  Then we have two witnesses with respect

 3    to Mr. Sayonkon's motion regarding the search of the Gateway

 4    Apartments.  One is Colleen Beltran, a leasing agent for

 5    those apartments, and the other is Officer Mike Peterson

 6    from the Brooklyn Center Police Department.

 7              THE COURT:  All right.

 8              MS. BRENNAN:  We may have Special Agent Flint

 9    testify on that issue, but at this point I'm not sure.

10              And then the fourth witness we have is Officer

11    Paul Bonesteel from the Columbia Heights Police Department

12    and he's going to testify regarding Mr. Samaan's motion

13    No. 131 regarding the officer's obtaining of the hotel

14    registry for the Starlite Motel.

15              THE COURT:  All right.  Please call your first

16    witness.

17              MR. WOLF:  Your Honor, if I might?

18              THE COURT:  Yes.

19              MR. WOLF:  I'm sorry, Judge.  I would just move

20    for sequestration of witnesses.  I'm not sure who's in the

21    courtroom.

22              THE COURT:  Ms. Brennan, if your witnesses --

23    other than the witness you intend to call first, are your

24    other witnesses present?

25              MS. BRENNAN:  Yes, Your Honor, my witnesses have

1    self-sequestered themselves in the hallway.

2              THE COURT:  All right.  Go ahead and call your

3    first witness, then.

4              MS. BRENNAN:  The government calls Special Agent

5    Mike Olson.

6              THE COURT:  Raise your right hand.

7         (Witness sworn)

8              THE COURT:  Thank you.  Please be seated and

9    please state your full name, spelling your last name, and

10   also provide your title.

11             THE WITNESS:  My name is Michael Olson, O-l-s-o-n,

12   and I'm a senior special agent with the U.S. Secret Service.

13             THE COURT:  Please proceed, Ms. Brennan.

14             MS. BRENNAN:  Thank you, Your Honor.

15                         **(Michael Olson)**

16                       **DIRECT EXAMINATION**

17   BY MS. BRENNAN:

18   Q.  Special Agent Olson, what are your duties as a special

19   agent with the Secret Service?

20   A.  I have basically two major sets of duties.  One is a

21   criminal investigator to investigate various different

22   financial crimes: bank fraud, identity theft, money

23   laundering, counterfeiting, check forgery, fraud.  And then

24   we also are involved in protection of the United States

25   President and Vice President and other world leaders.

1    Q.  How long have you been a special agent with the Secret

2    Service?

3    A.  I'm at about 19 years right now.

4    Q.  Have you been involved, as part of your duties in the

5    investigation that brings us here to this case today, in the

6    investigation of Mr. Sesay and the other defendants?

7    A.  Yes, I have.

8    Q.  Now, I want to bring you back to June 26th of 2012.  Do

9    you recall whether there was any significant events that

10   occurred that day?

11   A.  Yes, I do.

12   Q.  Can you just briefly describe what was going on on

13   June 26, 2012.

14   A.  On that date we conducted and executed numerous federal

15   search warrants at a number of residences and vehicles of

16   individuals associated with this case, to include Mr. Sesay

17   and others.

18   Q.  And as part of -- I presume that you were not present at

19   the execution of every single warrant on that day?

20   A.  That's correct, I was not.

21   Q.  Okay.  Do you recall which warrant or warrants you were

22   present for and whether you encountered Mr. Sesay and

23   Mr. Kromah at any of those locations?

24   A.  Yes, I do.

25   Q.  Can you describe that.

1    A.  Yes.  I was part of the entry team and search warrant

2    team at Mr. Sesay's residence, which was -- if memory serves

3    me right, I think it was 6550 67th Avenue North in Brooklyn

4    Center.  And I was also -- also at the residence that

5    morning was Mr. Mohammed Kromah.

6    Q.  Okay.  And so you entered that residence with a federal

7    search warrant in hand, correct?

8    A.  That's correct.

9    Q.  And can you describe the interactions that either you or

10   other agents had with Mr. Kromah and Mr. Sesay.

11   A.  Yes.  Once we made entry into the apartment complex,

12   Mr. Sesay, Mr. Kromah, and Mr. Sesay's I think it was his

13   girlfriend at the time, Nancy Pabai, were initially

14   handcuffed while we finished sweeping the entire apartment

15   for officer safety.

16   Q.  So they were handcuffed inside the apartment --

17   A.  Correct.

18   Q.  -- is that correct?

19   A.  Yes.

20   Q.  Okay.  And was Mr. Sesay, Mr. Kromah, and Ms. Pabai,

21   were those the only people present in the apartment?

22   A.  There was a small child as well.  I think it was the

23   child of Mr. Sesay and his girlfriend.

24   Q.  Okay.  Were Mr. Sesay and Mr. Kromah advised at that

25   point about whether they were under arrest?

1    A.  Yeah.  Initially they were advised of the federal search

2    warrant and what the purpose of the search warrant was and

3    that it was for bank fraud.

4           And then eventually myself -- I had a conversation

5    with Mr. Sesay eventually and I believe it was Special Agent

6    Curt Chapa of the Secret Service had a conversation with

7    Mr. Kromah advising that even though we're doing a search

8    warrant and they were in handcuffs that day, that they were

9    not under arrest and that we were -- that was merely for

10   officer safety until the initial chaos of all the law

11   enforcement coming into the room was settled.

12          And eventually then I had conversations with both

13   about whether or not they wanted to be -- if we could

14   interview them and talk to them about what was going on and

15   what would happen from there.

16   Q.  And so at some point after the initial entry, after your

17   initial entry into the apartment, were Mr. Sesay and

18   Mr. Kromah unhandcuffed while the search was still going on?

19   A.  Yeah.  Well, they pretty much agreed almost right away

20   within the first 20 minutes of us being there that they

21   wanted to be interviewed.  In Mr. Sesay's case, who I talked

22   to, he actually did want to be interviewed, but didn't want

23   to be interviewed at the apartment complex.

24          So I offered that we could bring them down to our

25   office if they wanted to go, that they weren't under arrest

1    and didn't have to go.  And they were unhandcuffed somewhere

2    in that transition period of being willing to leave the

3    apartment itself --

4    Q.  Okay.

5    A.  -- and so then they were unhandcuffed.

6    Q.  Was the search still going on when you left the

7    apartment with Mr. Sesay and Mr. Kromah?

8    A.  Yes.  It was pretty much -- I don't even think it had

9    even officially started yet because law enforcement has to

10   set up computer equipment and things to log evidence in and

11   that.  So I think that was all still in the process of

12   happening.  So the official search itself probably began

13   after we departed the premises.

14   Q.  Okay.  So starting first with Mr. Sesay, he indicated he

15   wanted to be interviewed, but not there?

16   A.  Correct.

17   Q.  And so what happened next?

18   A.  So once -- I believe my recollection is that he wasn't

19   dressed, so we allowed him to get dressed and then we left

20   the apartment.  Both Mr. Kromah and Sesay came at the same

21   time.  They weren't handcuffed.  We walked down to my Ford

22   Explorer government vehicle, which was parked out in the

23   parking lot.

24   Q.  It's not a squad car?

25   A.  No.  It's just an unmarked plain Ford Explorer, four

1    doors.

2    Q.  Okay.

3    A.  We paused outside of the vehicle.  I again told both of

4    them that they weren't under arrest, that they did not have

5    to come with us down to the office, again that they were

6    doing this on their own free will.

7            Regardless of what they chose, they could cease

8    the interview at any time, they could ask us to turn around

9    and bring them back at any time.  And no matter what

10   happened at the end of the day, when they're ready to go

11   home we will, in fact, bring them home as well.

12   Q.  Okay.  And you say you again told them that.  So had you

13   originally told them that when you were still up in the

14   apartment?

15   A.  Yes, because they had the choice to stay at the

16   apartment while the search was being conducted.  While law

17   enforcement was doing that they would have, for officer

18   safety reasons, probably remained in handcuffs unless there

19   was enough law enforcement officers there for somebody to

20   keep an eye on them so they weren't interfering with the

21   search.

22           But we would have -- I know we told them upstairs,

23   because that's when they agreed to come down to the office

24   and that's when Mr. Sesay told me that he didn't even want

25   to be interviewed at the apartment anyway.

1        So we had that conversation upstairs and then we

2   had it again downstairs prior to them agreeing to get in the

3   car and come with us.

4   Q.   Okay.  So were Mr. Sesay and Mr. Kromah handcuffed when

5   they made their way out of the apartment down to your Ford

6   Explorer?

7   A.   No, they were not.

8   Q.   Okay.  So then you get to the Ford Explorer and you have

9   another conversation, right?

10  A.   That's correct.

11  Q.   What about -- were they handcuffed at that point?

12  A.   Yeah.  So I explained to them because our procedures are

13  even though they're not under arrest, but for officer safety

14  reasons when we're putting two individuals in the car at the

15  same time, that we needed to handcuff them for our safety.

16  They agreed.

17       And in addition, normally we would handcuff behind

18  the back.  We handcuffed them in front just simply so the

19  hands weren't free behind us as we were driving.  They both

20  agreed to that.

21       I think I recall giving them a bottle of water on

22  the way down and again I think we had the conversation on

23  the way down too that, you know, if you don't want to do

24  this, we can turn around and come back.  It wasn't that big

25  of a deal for us if they talked or not talked.

1    Q.  Okay.  And this was in Brooklyn Center; is that correct?

2    A.  Yes, that's correct.

3    Q.  So where did you take Mr. Sesay and Mr. Kromah?

4    A.  We took them down to the federal courthouse in

5    Minneapolis, 300 South 4th Street.

6    Q.  And that's where your office is?

7    A.  That is correct.

8    Q.  What happened when you got downtown Minneapolis to your

9    building?

10   A.  So we pulled into the secure parking area for our office

11   where our agents park.  We got out of the car in the garage.

12   We unhandcuffed them in the garage because we didn't want to

13   walk up to the courthouse in handcuffs and they weren't

14   under arrest anyway at that point.  It was just simply that

15   because they were seated behind us for the car ride down.

16          So we unhandcuffed them when we got out in the

17   federal garage and then we walked upstairs.  I think I even

18   told them again when we got out of the car you don't have to

19   come upstairs.  Again, we'll come back.  We'll take you home

20   if you want to.  At any time you don't want to talk, no

21   problem.  But they both were very cooperative and said, no,

22   we want to talk and we're willing to come up, so.

23   Q.  Now, you said your Ford Explorer was not a squad car.

24   Was there any kind of a cage or anything inside that

25   vehicle?

```
1    A.  Nope, there is not.

2    Q.  So it's just a regular Ford Explorer?

3    A.  Regular Ford Explorer.  There's just one small little

4    radio down by the front seat, down low in front of the front

5    seat.

6    Q.  Okay.  So you then proceed to accompany Mr. Sesay and

7    Mr. Kromah up to your offices on the 7th floor?

8    A.  That's correct.

9    Q.  And then what happened when you got to the Secret

10   Service offices?  Did you interview them at the same time or

11   separately?

12   A.  No.  When we first got up to the office, I don't

13   remember if there was any rhyme or reason as to who we asked

14   to go first or if one of them had volunteered to be

15   interviewed first.

16        But what I do remember is explaining -- it was

17   Mr. Sesay that was going to be interviewed first and then

18   explaining to Mr. Kromah that he could have a seat in our

19   lobby of our office on the 7th floor, that he didn't have to

20   stay there, that if he wanted to leave he was welcome to

21   leave the courthouse if he chose.  I think I remember

22   telling him about there's the Federal Café on the first

23   floor.  I remember pointing out the bathrooms, where they

24   were.  So if he wanted to leave and go use the bathroom,

25   that would be fine.  When we were done talking with
```

1    Mr. Sesay, we would come back and check if he's there in the

2    lobby.

3    Q.  So the lobby for the Secret Service, if I'm sitting in

4    the lobby, is there a security door?  I mean, do I need to

5    buzz anyone if I want to get up and walk out of that lobby?

6    A.  No.  It's inside double doors with our logo on the front

7    doors and there's a couple chairs with magazines there.

8    Anybody can come and go out of that lobby area.

9    Q.  So is Mr. Kromah handcuffed or anything when he's

10   sitting in that lobby?

11   A.  Nope.  Cuffs came off in the garage earlier.

12   Q.  So you first take Mr. Sesay back, now, behind the

13   security door at the Secret Service, right?

14   A.  That's correct.

15   Q.  What type of a room were you in with Mr. Sesay?

16   A.  We went to our main conference room.  It's just a large

17   big mahogany conference table that seats about 10 people.

18   Q.  Do you recall who was present for the interview of

19   Mr. Sesay?

20   A.  Yep.  It was myself, a task force officer named Dave

21   Lindman, who is an Edina police officer and was assigned to

22   the task force at the time, and then another Secret Service

23   agent named Ryan Arnold.

24   Q.  What did you -- how did you sort of begin the interview

25   of Mr. Sesay?

1    A.  I believe we re-approached the idea that he did not have

2    to be there.  Again, this was a voluntary interview, he

3    didn't have to be there.  He could stop the interview at any

4    time.  If he wanted to leave at any time, that was fine.

5    That's how the initial conversation started.

6         I explained to him generally what the case was

7    about, that it was a bank fraud case, which I would do with

8    anybody I interviewed so they understand why they're there.

9    We had already explained that back at the apartment anyhow.

10   And then we got right into discussing some of the facts of

11   what we knew in the case and started the interview.

12   Q.  And Mr. Sesay was not handcuffed, correct?

13   A.  No, he was not handcuffed.

14   Q.  Okay.  So how long -- do you remember approximately how

15   long you were talking with Mr. Sesay?

16   A.  Yeah.  It was a while.  It was a couple hours because I

17   think we got down there about 9:00 -- it was after 9:00,

18   approaching 10:00, I think, and I think we finished the

19   interview sometime after noon, I want to say 12:30, 12:15

20   maybe.

21   Q.  Okay.  And then what happened when you were finished

22   talking with Mr. Sesay?

23   A.  We just left it as if he wanted to speak with us again,

24   I think I gave him my business card.  You know, we were

25   interested in talking to Mr. Kromah, so we were going to

1    bring him out to the lobby.  He is welcome to stay there and

2    wait and we'll give them a ride back when they're done.  If

3    he didn't want to stay there, he could leave.  I think I

4    told him where the bathroom was, just like I had told

5    Mr. Kromah.  Mr. Kromah was, in fact, in the lobby of our

6    office there when we came out with Mr. Sesay.

7    Q.  Okay.

8    A.  And we just traded places and brought Mr. Kromah back to

9    the same conference room.

10   Q.  Okay.  So you bring Mr. Kromah back and Mr. Sesay is now

11   in the lobby, right?

12   A.  Correct.

13   Q.  And did you have any discussions with Mr. Kromah when

14   you sat down at -- the same conference room?

15   A.  Same conference room, yes.

16   Q.  Was it the same people still present for that interview?

17   A.  At this point Curt Chapa, who had run the search warrant

18   site at the residence, the apartment complex where we had

19   found them that morning, joined us in the interview.  So I

20   think he either had cleared the search warrant or left early

21   while other people finished the search because I think he

22   had obtained information from the search warrant that was

23   relevant if we continued to have conversations, so we could

24   have that information with us.  So he joined us is what I'm

25   trying to say.

1    Q.  Okay.  So did you have any conversations with Mr. Kromah

2    when you sat down in the conference room?

3    A.  Yes.  It was the same thing.  Started off again,

4    especially because it had been a couple hours since we had

5    last advised him, he didn't have to be there.  It was again

6    explained what the case is about, that he wanted to come

7    down here and talk to us willingly, that he did not need to

8    talk to us, that he was not under arrest.  He could get up

9    and leave, he could stop the conversation at any time he

10   wanted and we'd bring him home if that's what he wanted us

11   to do.

12   Q.  Okay.  And then did Mr. Kromah indicate that he wanted

13   to -- continued to want to talk to you?

14   A.  Yes, he did.

15   Q.  How long do you think you visited -- interviewed with

16   Mr. Kromah?

17   A.  I think his was shorter.  My recollection is it was from

18   about -- until just a little after 2:00, maybe quarter after

19   2:00, 2:20, something like that.  So about an hour and a

20   half.

21   Q.  Okay.  And then when you finished talking with

22   Mr. Kromah, what happened then?

23   A.  We went back out to the lobby and I think it was in the

24   lobby when they both were together that we decided where

25   they wanted us to bring them back to.  They did not want to

1    go back to the apartment complex that we had found them at

2    in the morning.  They wanted to go to North Minneapolis.

3    Q.  And you say, "they."  You're talking about Mr. Sesay and

4    Mr. Kromah?

5    A.  That's correct.

6    Q.  So who decided where you were going to bring them?

7    A.  Well, I think it was mostly Mr. Sesay that had decided,

8    but they wanted to go basically to a strip mall area at the

9    corner of Broadway and Lyndale Avenue North in North

10   Minneapolis.

11   Q.  Okay.  And then so you -- do you recall who was with

12   when you took them there?

13   A.  Yeah.  It was myself and Detective Lindman from Edina

14   Police.

15   Q.  And did you take them again in the same Ford Explorer?

16   A.  Yes.

17   Q.  Were they handcuffed?

18   A.  No.  I think -- I don't recall once we got back down to

19   the garage if we handcuffed them again for our safety or if

20   at this point I think because of -- you know what?  I don't

21   think we did because at that point they had gone through the

22   metal detectors at the federal courthouse, so we knew

23   between -- I think we did -- I want to say we might even

24   have done a cursory search before we put them in the car or

25   during the search warrant because it would have been -- the

1    search warrants covered the search of their person as well.

2    Q.  Yeah.

3    A.  But anyway, the point is the courthouse was secure, so

4    we felt better that there was no weapons or anything like

5    that on them.  So I don't even think we handcuffed them on

6    the way back to where we dropped them off that day.

7    Q.  But in any case, they were not handcuffed when you went

8    down from your office --

9    A.  No.

10   Q.  -- back down to the parking garage?

11   A.  Correct.

12   Q.  And then you dropped them off where they asked you to

13   drop them off?

14   A.  Yes.

15   Q.  All right.  We're going to fast-forward now a little bit

16   to around October 14th of 2015.  Do you remember an event

17   that day involving Mr. Dejoachim?

18   A.  Yes, I do.

19   Q.  Can you describe what happened that day.

20   A.  Yes.  As part of the case and the follow-up

21   investigation of this, myself and Special Agent Randall

22   Flint drove up to I believe it was the Rush City

23   correctional facility in Minnesota.

24   Q.  Why did you go up there?

25   A.  To interview Picasso Dejoachim.

1    Q.  And that's where Mr. Dejoachim was incarcerated on state

2    charges, correct?

3    A.  That's correct, for an unrelated charge to our

4    investigation.

5    Q.  Okay.  So what happened once you got up to Rush City?

6    A.  We were brought into some sort of a conference room or

7    library kind of thing within the prison facility.  The

8    prison guards told us we could interview in that room.  And

9    then we waited there for a little bit and then eventually

10   the prison guards brought Mr. Dejoachim into the room, and

11   we showed our Secret Service credentials and explained to

12   him who we were and why we were there as far as

13   investigating a bank fraud case that he had been a part of.

14   Q.  Now, this is a contact room, right, it's like a library

15   type room where you're siting next to Mr. Dejoachim?

16   A.  Yeah.  I mean, it was conference tables much like

17   defense counsel and defendants are at at the table right

18   there.  I remember there were some TVs in there and some

19   computers along some side walls, I think, and --

20   Q.  Okay.

21   A.  That's correct.

22   Q.  So do you and Special Agent Flint, do you have your

23   weapons on you at this point?

24   A.  No.  We wouldn't have been allowed to bring them into a

25   prison facility.

1    Q.  Okay.  And are you in plain clothes?

2    A.  Yes.

3    Q.  Do you recall what type of -- you know, what you told

4    Mr. Dejoachim about, you know, what you were doing there and

5    what his options were in respect to talking with you?

6    A.  Yeah.  I mean, same thing.  This whole investigation,

7    anybody we talked to, you know, you don't need to talk to

8    us, you're not under arrest.

9            But, you know, in his case, because he was in a

10   prison facility, we chose to read him his Miranda warning

11   anyway even though it wasn't -- we explained to him that

12   we're not the ones that are making the decisions on charges

13   involving you.  We're here to investigate.  We have

14   information as part of this case.

15           And we had done a search warrant at his house a

16   couple years prior, actually three years prior.  So I don't

17   know if he remembered us specifically, but we had told him

18   it was in relation to the case that involved that search

19   warrant that had occurred back in 2012 at his residence and

20   then, again, that he didn't have to talk to us.

21   Q.  Okay.  And so you weren't -- you told him you weren't

22   making any kind of an arrest or anything like that on this

23   bank fraud case, right?

24   A.  That's correct.

25   Q.  Okay.  But you did read him his Miranda rights?

```
 1    A.  We did.

 2    Q.  Do you recall if you had him sign anything?

 3    A.  Yes.

 4              MS. BRENNAN:  May I approach, Your Honor?

 5              THE COURT:  Yes.

 6              THE WITNESS:  It's the form we had him sign.

 7    BY MS. BRENNAN:

 8    Q.  Do you recognize -- I'm showing you Government Exhibit

 9    Number 22.

10    A.  Yes, I recognize that.

11    Q.  And what is that?

12    A.  That's a standard Secret Service form.  Its code is

13    SSF-1737C.  It's a Miranda waiver -- a warning and waiver

14    form, that we read the rights that are stated right on there

15    and then we sign and date it and have them sign it.

16    Q.  Okay.  And did you witness Mr. Dejoachim signing this

17    form at the date and time indicated on the form?

18    A.  Yes, I did.

19              MS. BRENNAN:  The government offers Exhibit 22.

20              THE COURT:  Any objection?

21              MR. LE:  No objection.

22              THE COURT:  Exhibit 22 will be received.

23    BY MS. BRENNAN:

24    Q.  After you explained Mr. Dejoachim's rights to him and he

25    signed the waiver form, did he indicate whether or not he
```

1      wanted to speak with you?

2      A.  Yes, he did and did want to speak with us as well, yes.

3      Q.  And do you recall how long you spoke with him?

4      A.  It was -- my recollection is no more than an hour.  It

5      was -- I think it was maybe like 45 minutes.

6      Q.  Now, I should back up.  We didn't specifically say this,

7      but with respect to the statements that you took from

8      Mr. Kromah and Mr. Sesay on June 26th of 2012, you did not

9      read them their Miranda rights; is that correct?

10     A.  No, that's correct, because they were not in custody.

11     We advised them of that repeatedly, as I mentioned, and told

12     them they didn't have to talk to us.

13     Q.  Thank you.  I don't have any further questions, Special

14     Agent Olson.

15              THE COURT:  Why don't we start with Ms. Durham.

16              MS. DURHAM:  Thank you, Your Honor.

17                        **CROSS EXAMINATION**

18     BY MS. DURHAM:

19     Q.  Good morning, Agent.

20     A.  Good morning.

21     Q.  So actions speak louder than words, yes?

22     A.  Sometimes, yes.

23     Q.  So you arrive at Mr. Sesay's residence and handcuff him

24     and handcuff the two other adults in the house, yes?

25     A.  That's correct.

1    Q.  How many agents and law enforcement officers are there

2    to do the search warrant execution?

3    A.  I don't recall.  There would have been at least a half

4    dozen plus an analyst that does the computer stuff.

5    Q.  You used a phrase on direct, "chaos," because everybody

6    is sort of trying to set up and the energy is moving and

7    you've got these three adults sitting with their hands

8    cuffed, yes?

9    A.  Yes.

10   Q.  And so all of those officers and with a federal search

11   warrant in your hand you talk to Mr. Sesay and say, We can

12   certainly talk with you somewhere else, let's go downtown to

13   our office, yes?

14   A.  Yes.

15   Q.  You walk him down to your vehicle and you handcuff him

16   again, true?

17   A.  After asking his permission to do so, yes.

18   Q.  And you say that you're continually saying to him, hey,

19   you're not really under arrest, but your actions show that,

20   in fact, he can't walk away?  He can't leave with your

21   handcuffs, true?

22   A.  No, we didn't -- I don't think so.  I mean, on top of

23   telling him and handcuffing him in the front, then

24   explaining to him it's just for our safety and offered him a

25   bottle of water, I don't believe that the actions spoke any

1    louder than the words.

2    Q.  And so you take him downtown to the Minneapolis

3    courthouse?

4    A.  That's correct.

5    Q.  And the area that you drive the car into or your vehicle

6    is, in fact, a locked garage, true?  I can't simply drive in

7    there, correct?

8    A.  Correct.  The initial garage where you come in, you need

9    a pass -- keycard pass to open it.

10   Q.  And when you leave, there's -- we call them blue coats.

11   The courthouse security has a little station there to leave

12   out or is it a different part of that secured parking area?

13   A.  No, from that it's -- yeah, if you were going to go out

14   the garage at that point, the actual garage doors, you would

15   go by the booth that the court security officers have there,

16   but there's other ways to get out of the garage.

17   Q.  Right.  So Mr. Sesay couldn't have just left that garage

18   without somebody allowing him to go?

19   A.  Well, at that time you could actually walk out and I

20   think it triggered -- you didn't need a pass to get out, the

21   vehicle would trigger it to depart.  That's different now,

22   but back in 2012 I think you could walk up the ramp.

23   Q.  Unless you are sitting handcuffed in the back of a car

24   with two federal agents in the front seat, right?

25   A.  Well, again, he was told many, many times before we got

1    to that point that he could just simply ask to be allowed to

2    leave.

3    Q.  And Ms. Brennan asked you about your weapons.  Do you

4    carry a firearm sometimes?

5    A.  Yes.

6    Q.  Did you have a firearm when you got to the residence for

7    the search warrant?

8    A.  Yes.

9    Q.  Do you know if the other officers did or likely would

10   have?

11   A.  Yes, they would have.

12   Q.  Okay.  So once you get to the Secret Service office on

13   the 7th floor -- yes?

14   A.  Yes.

15   Q.  -- of the Minneapolis federal building, you go in and

16   you have to be admitted?  Once you go through the little

17   lobby, you have to get -- somebody buzzes you into it, yes?

18   A.  Unless we escort them in, yes.

19   Q.  And even you have to be buzzed?

20   A.  No.  I can either key in a key or use a key to get in.

21   Q.  Okay.  And then how far down the hallway is it that the

22   interview room was that you had Mr. Sesay?

23   A.  You walk forward about eight feet and you take a right

24   and you walk 20 feet at the most and then it's to the right

25   into the conference room.

```
 1    Q.  Okay.  And it's you and two other agents at the time of

 2    the interview?

 3    A.  Correct.

 4    Q.  Okay.  No Miranda given at any point?

 5    A.  No.

 6              MS. DURHAM:  Nothing further.  Thank you, Your

 7    Honor.

 8              THE COURT:  Mr. Udoibok?

 9              MR. UDOIBOK:  Thank you.  Also thank you for

10    pronouncing my name.

11              THE COURT:  I try to do that.  Mine often gets

12    mispronounced as well.  So please correct me if I --

13              MR. UDOIBOK:  You did just fine.

14                          CROSS EXAMINATION

15    BY MR. UDOIBOK:

16    Q.  Good morning, Officer.

17    A.  Good morning.

18    Q.  I'm not going to repeat my colleague's questions.

19    A.  Okay.

20    Q.  I want to take you back to the Secret Service office.

21    A.  Yes.

22    Q.  If you want to exit, can you just leave --

23    A.  Yes.

24    Q.  -- without being buzzed out?

25    A.  Yes.
```

1    Q.  How many officers at the 650 -- the apartment, how many

2    officers were there?

3    A.  I don't recall the exact amount.  There would have been

4    a report written by Agent Curt Chapa that would have

5    probably named everybody that was there.  I just don't

6    recall the exact -- I can tell you with myself and Dave

7    Lindman leaving, there would have had to have been minimally

8    probably four to six additional officers because we weren't

9    a part of the search initially.

10   Q.  What time of day was it?

11   A.  We got to the apartment at about I think it was 8:30 in

12   the morning.

13   Q.  Was Mr. Kromah fully dressed?

14   A.  I don't recall Mr. Kromah.  I know -- I'm pretty sure

15   Mr. Sesay was not because I want to say he might have been

16   in bed.  I don't recall with Mr. Kromah.

17   Q.  Prior to your executing the search warrant, did you have

18   any information about Mr. Kromah's medical condition?

19   A.  Nothing specific, no.  I mean, we had --

20   Q.  Generally what did you know?

21   A.  We just observed him during surveillances leading up to

22   that day and saw that he walked with a limp.  Other than

23   that, we had no specifics.

24   Q.  And when you met him that day, did you see sort of a

25   scar?

1    A.  I'm sure I did, yeah.

2    Q.  Did he strike you at that meeting that he may be of

3    diminished capacity at all?

4    A.  Not so much diminished capacity because I guess when we

5    started interviewing him, he seemed to understand the

6    questions and answer questions that we knew he would have

7    the answer to and he answered them.

8    Q.  But is it your testimony that it didn't occur to you

9    that -- when you talked to him, he didn't have any memory

10   issues?

11   A.  I'm trying to remember if we asked him about it or if we

12   had a conversation about it and he had said he had had a

13   head injury when he was -- I don't remember if it was when

14   he was younger or as a child or what, but I know we had the

15   conversation like do you understand, you know, some of the

16   topics and there was no issues as we moved forward in the

17   interview.

18   Q.  Isn't it fair to say that the reason you had that

19   conversation was you received the impression that he wasn't

20   quite tracking you?

21   A.  No.  I think it came up, as you said, because I think as

22   we saw him for the first time as close as we did, the

23   conversation came up either by him or as a result of the

24   scar on his head and asking him about it, I think.

25   Q.  And you testified that he walked with a limp?

1     A.   Um-hmm.

2     Q.   And yet you had him in handcuffs, right?

3     A.   Just during that car ride down.

4     Q.   At what point did you eliminate the need to record your

5     conversations with him?

6     A.   We have never, federal agencies never, Secret Service,

7     we don't -- as a matter of policy don't record

8     conversations.

9     Q.   All right.  And at what point did you eliminate reading

10    him the Miranda?

11    A.   That began right at the apartment complex because we

12    went above and beyond, in my opinion, with both Mr. Sesay

13    and Mr. Kromah to advise them that they did not have to come

14    down and talk to us.

15         They both indicated at the apartment that they

16    wanted to cooperate, they wanted to -- and quite frankly, my

17    impression when we talked to them is they were more curious

18    than anything about what we had on them, what this was

19    about, what kind of information we had as part of the

20    investigation.

21    Q.   Isn't it fair to say that you had decided even before

22    you entered the apartment that this was not going to be a

23    Mirandized interview?

24    A.   Well, we had no intentions of arresting them, so I think

25    your question -- the answer is yes because we weren't

1    arresting them, but we also wanted to make sure that they

2    knew that they didn't have to talk to us as part of this

3    case.  We didn't need them to talk to us.

4    Q.  So you had Mr. Kromah in handcuffs sitting on a couch,

5    your testimony was, but he was free to leave, you said?

6    A.  They would have been advised by probably Curt Chapa, who

7    was the search team leader, that when we got there, once we

8    had established that the apartment was safe, that standard

9    procedure is you can stay; and if you stay, you may be

10   handcuffed.  If you want to leave, you are welcome to leave

11   the premises while the search is going on and you can be

12   unhandcuffed and leave.

13   Q.  But I thought the testimony was they were free to leave.

14   A.  They were free to leave.

15   Q.  But they were in handcuffs.

16   A.  There were handcuffs initially when we first arrived to

17   do the search warrant.

18   Q.  But yet you took off the handcuffs and asked them you

19   can go if you want?

20   A.  That would have been explained to them, that they could

21   leave.  But separate of that conversation, myself and

22   Detective Lindman had conversations with each of them asking

23   them if they wanted to speak with us about the case.

24   Q.  Officer, what I think the Court has to do is -- we want

25   to know what Mr. Kromah was thinking and what you were

1    thinking.

2    A.  Um-hmm.

3    Q.  He's in handcuffs sitting, yet your position is he's

4    free to leave.  But he can't leave while handcuffed,

5    correct?

6    A.  He could have left.  Any time we do a search warrant, if

7    somebody wants to stay at the location that we're conducting

8    a search warrant at, they're usually told you need to stay

9    in handcuffs and you can sit on the couch, whatever.  If you

10   want to stay here, that's fine.  If you want to get up and

11   leave, we'll take the handcuffs off, we'll escort you off

12   the premises and you can leave.  And that's what he would

13   have been told.

14          But aside from that, myself and Detective Lindman

15   had conversations with both of them specifically about being

16   interviewed because they were subjects of the investigation

17   and they agreed to be interviewed.

18          So they were unhandcuffed because they were coming

19   down to the car, as I mentioned, of their own free will, but

20   it was once we got to the car, that for our safety again,

21   because they're going to be seated behind us in a noncaged

22   car, I told them would you like to be -- if you want to go

23   down, we're going to handcuff you for our safety.  If you

24   don't want to do that, you don't have to come with us.

25   Q.  I'm not going to belabor this.  I just want to

1    understand:  At what point was the handcuffs off and who

2    took it off?

3    A.  I don't know who took them off, but they would have been

4    taken off prior to us leaving the apartment before we walked

5    down to my car.

6    Q.  Is it fair to say that the handcuffs were taken off

7    simultaneously as you were leaving to your car?

8    A.  I'm not sure I understand the question,

9    "simultaneously."

10   Q.  Well, you took off the handcuffs and you left with both

11   of them, Mr. Kromah and Sesay, to the Minneapolis

12   courthouse?

13   A.  We walked down -- I think they were on the third floor

14   of the apartments, so we walked down.  They walked down

15   unhandcuffed from the third floor down to my car, which is

16   in the parking lot, and we had the conversation again about

17   if they wanted to cooperate, if they wanted to come down and

18   talk to us, if the answer was yes, then we're going to ride

19   down in my car, but for our safety we're going to put

20   handcuffs back on you while we escort, bring you down to the

21   courthouse.  And so we put handcuffs back on them outside of

22   my car in the parking lot of the address that we found them

23   at.

24   Q.  And then when did the handcuffs come off again?

25   A.  And then as soon as we arrived in the federal garage of

1    the Minneapolis courthouse, which is, if I recall from my

2    report, roughly 20 minutes later, we took them off in the

3    garage before we walked up into the courthouse.

4    Q.  And when they were in the courthouse, is it your

5    testimony that they could say, nope, I'm not coming, I just

6    want to go?

7    A.  That is my testimony and that is exactly what we told

8    them.

9              MR. UDOIBOK:  No further questions.

10             THE COURT:  All right.  Mr. Le.

11             MR. LE:  Thank you, Your Honor.

12                        **CROSS EXAMINATION**

13   BY MR. LE:

14   Q.  Good afternoon, Agent Olson.

15   A.  Good afternoon.

16   Q.  So your involvement as an investigator in this case

17   began roughly sometime around June of 2012 or sometime in

18   2012?

19   A.  Actually, my involvement began much earlier than that.

20   Q.  Okay.  And you testified, though, that you were a part

21   of a search warrant execution on June 26th of 2012?

22   A.  Yes, that's correct.

23   Q.  And prior to that you were the author of a search

24   warrant affidavit with regards to the search warrant

25   obtained; is that correct?

1    A.  Yes, I was.

2    Q.  And you recall that search warrant affidavit, correct?

3    A.  Yes.

4    Q.  And so that search warrant affidavit was 177 paragraphs

5    and then you executed it on I believe June 19th of 2012?

6    A.  I would have to look at the warrant again, I haven't

7    reviewed it recently, as far as the amount of paragraphs and

8    the exact dates.

9              MR. LE:  Your Honor, I'm referring to Exhibit

10   Number 2 that's been stipulated into evidence.

11   BY MR. LE:

12   Q.  Olson Agent, would it refresh your recollection to look

13   at your affidavit?

14   A.  If you would like me to answer questions regarding it,

15   yes, please.

16             MS. BRENNAN:  Your Honor, I'm going to object to

17   outside the scope of his direct examination and ask that

18   Mr. Le indicate how this relates to the statement of

19   Mr. Dejoachim.

20             THE COURT:  It does sound like it may be wandering

21   outside the scope of the direct.  Mr. Le, can you tie it in?

22             MR. LE:  Your Honor, I guess I'll just move

23   forward --

24             THE COURT:  All right.

25             MR. LE:  -- and not pursue that line of

1    questioning.

2              THE COURT:  All right.

3    BY MR. LE:

4    Q.  So this conversation that you had with Mr. Dejoachim, it

5    took place on or about October 14, 2015?

6    A.  That's correct.

7    Q.  And that was at the Rush City correctional facility?

8    A.  That's correct.

9    Q.  How did you locate him?

10   A.  It would have been my partner Randall Flint, I think, or

11   maybe one of the analysts on the case that knew he was

12   incarcerated up there on a previous case from the state.

13   Q.  And you previously testified earlier today that you were

14   a part of the search warrant execution involving

15   Mr. Dejoachim in about August of 2012?

16   A.  Yes, I was.

17   Q.  So this interview took place roughly over three years

18   after the search warrant execution?

19   A.  That's correct.

20   Q.  And you and Agent Flint initiated this interview; is

21   that correct?

22   A.  That's correct.

23   Q.  And so when you arrived at the Rush City facility, you

24   were brought to a room; is that --

25   A.  Yes.

1    Q.  And you described that room?

2    A.  Yes, I did.

3    Q.  So are you familiar that most conversations that take

4    place in a prison facility are monitored?

5    A.  I don't spend a lot of time in the state prison system.

6    I know that they can be, depending on where you are, but I

7    don't recall if this one was or wasn't.

8    Q.  So you weren't aware of whether it was recorded or

9    monitored in any shape or form?

10   A.  I don't recall, no.

11   Q.  And during your discussion with Mr. Dejoachim on the

12   14th, October 14, 2015, did you discuss any enticements or

13   benefits for his cooperation or his being honest with you

14   with respect to your questions that day?

15   A.  I know we told him that if he was going to talk to us,

16   that it was important that he tell the truth and that it's

17   not up to us as far as what happens with him, it's up to the

18   U.S. Attorney's Office how his case is charged and what

19   happens to him.  I'm sure we told him that there was

20   numerous defendants or potential defendants in the case,

21   that obviously anybody that lies is not going to help

22   anybody that seeks to cooperate.  He stated, I think it's

23   written in the report, to the affirmative that he understood

24   all that and was going to tell the truth.

25            I think we -- as a matter of fact, with him we

1    actually emphasized if there was something you didn't even

2    want to -- if there was something that you weren't

3    comfortable talking about, don't even bring it up then

4    because you don't want to lie about it.  That's basically

5    what it was.  Don't tell us anything that you are going to

6    lie about.  If there's just something that you don't want to

7    discuss, then just don't discuss it with us.  Don't discuss

8    it because we think -- you think we want to talk about it

9    and then lie about it.

10   Q.  And so this conversation did take place at a jail

11   facility or prison facility; is that correct?

12   A.  That's correct.

13   Q.  And so even though you had testified that he was free to

14   not cooperate, the reality of the situation is he wasn't

15   going anywhere that day, was he?

16   A.  Well, he was well aware he was in custody on state

17   charges.  Because he was in a jail, we went the extra step

18   and read him his rights anyway.

19   Q.  Did you have an arrest warrant for the federal charges

20   with you on that day?  Was it your intention to possibly

21   discuss an arrest of him into federal custody that day?

22   A.  Not that day, no, but I'm sure we were clear that this

23   was a federal investigation and that whatever charges were

24   decided were being decided by the U.S. Attorney's Office.

25   Q.  And as a part of this discussion, did you inquire about

1    a James Capehart?

2    A.  I know that name came up.  I don't recall if we inquired

3    by name or if it was a result of us showing some photographs

4    and if he offered the name.  I don't recall.  I would have

5    to review the report from that day.  But the name did come

6    up, I do recall that.

7    Q.  And did you or Agent Flint generate a written report or

8    memorandum that memorialized your discussions with

9    Mr. Dejoachim on October 14th of 2015?

10   A.  Yes, Agent Flint did it.

11   Q.  And was that generated from recordings or was that just

12   generated from basically your memory and notes of the

13   conversation at a subsequent time?

14   A.  The latter, memory and notes.

15   Q.  And how long did this discussion last?

16   A.  I think I mentioned before I don't recall the exact

17   time, but I want to say it was no more than an hour, it

18   might have been 45 minutes, from the time that we started

19   the conversation until we finished.

20   Q.  And you were absolutely clear that this did not mean

21   that Mr. Dejoachim wasn't facing any further charges as a

22   result of the investigation that you were conducting that

23   subsequently led to this case being indicted?

24   A.  If I understand your question right, the answer is we

25   would never make a promise to somebody about what is going

1    to be the outcome of their case.  We can't do that.  That's

2    up to the U.S. Attorney's Office.

3    Q.  But --

4    A.  So whatever -- the details of the questioning would have

5    been we're asking for your truthfulness, honesty.  You don't

6    have to answer the questions, but if you do, just answer

7    truthfully.  Whatever happens is going to be up to the U.S.

8    Attorney's Office.

9    Q.  But answer truthfully because you potentially can get

10   charged as a result of whatever you say to us this day?

11   A.  Well, I don't think he was left with any doubt that

12   there's going to be the potential for future charges on the

13   case, if that's --

14   Q.  Yep, that is the question.

15   A.  No.  Yeah, he would have been told that there's most

16   likely charges, but we just don't know what those are and

17   what the outcome will be.

18   Q.  And so going back to how you located him, it was Agent

19   Flint that located where Mr. Dejoachim was being -- had been

20   incarcerated?

21   A.  I believe so, and I don't know if it was directly him or

22   if he went through like a state investigator or an analyst

23   to find out exactly where he was housed at.

24   Q.  Mr. Dejoachim didn't contact you or Agent Flint, did he?

25   A.  No.

```
 1                    MR. LE:  I have nothing further.

 2                    THE COURT:  Thank you.

 3                    Any redirect, Ms. Brennan?

 4                    REDIRECT EXAMINATION

 5      BY MS. BRENNAN:

 6      Q.  Special Agent Olson, with respect to Mr. Dejoachim, did

 7      you say anything to him like you're going to go to prison

 8      for ten years?

 9      A.  No.

10      Q.  Or you're going to go to prison for a really long time

11      or something like that?

12      A.  No.

13      Q.  I want to talk about Mr. Kromah briefly.  Did you sense

14      or get the impression when speaking with Mr. Kromah that he

15      didn't understand what was happening?

16      A.  No.

17      Q.  Did he answer questions that you asked him?

18      A.  Yes, he did.

19      Q.  Were his questions -- or were his answers, you know,

20      nonsensical to you in any way?

21      A.  No.  They made perfect sense.

22      Q.  He admitted to you certain things that you already knew,

23      right?

24      A.  That's correct.

25      Q.  He told you that he would get the checks, he would carry
```

```
1    counterfeit checks in a magazine in his car so that they

2    wouldn't be easily detected by law enforcement, right?

3    A.  That's correct.

4    Q.  And that's one of the things that you already knew from

5    conducting surveillance in this case?

6    A.  That's correct.

7              MS. BRENNAN:  Thank you.  No further questions.

8              THE COURT:  Thank you.

9              Anything further with respect to either

10   Mr. Dejoachim or to Mr. Kromah in light of the redirect?

11             MR. UDOIBOK:  No, Your Honor, for Kromah.

12             MR. LE:  No from Mr. Dejoachim.

13             THE COURT:  All right.  Special Agent Olson, you

14   can step down.  Thank you.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  We've been going close to an hour and

17   a half.  I don't want to go too long before we give our

18   court reporter a bit of a break.  Let me ask you,

19   Ms. Brennan, what you estimate in terms of your next

20   witness.

21             MS. BRENNAN:  Your Honor, I expect my next three

22   witnesses all to be much shorter than Special Agent Olson.

23             THE COURT:  But they're sort of all of apiece in

24   terms of the subject matter?

25             MS. BRENNAN:  The next two witnesses are.
```

1    Ms. Beltran and Officer Peterson are part of the same

2    transaction.  And then there's Officer Bonesteel, which is

3    separate.

4              THE COURT:  I'm wondering if we should take a

5    break.  Hold on just a moment.

6         (The Court and court reporter confer)

7              THE COURT:  She indicated she can keep going, so

8    call your next witness.

9              MS. BRENNAN:  Your Honor, the government calls

10   Colleen Beltran.

11             THE COURT:  Please step toward the stand.  Yeah,

12   go on up there, but before you sit down I'm going to have

13   you raise your right hand.

14        (Witness sworn)

15             THE COURT:  I'm going to have you sit down and

16   when you get yourself settled in, please state your full

17   name and spell your last name.

18             THE WITNESS:  Colleen Ann Beltran, B-e-l-t-r-a-n.

19             THE COURT:  And Ms. Beltran, I'm going to ask you

20   when you testify to be sure to speak into the microphone so

21   that I can hear you and our court reporter can hear you and

22   all of them can hear you.

23             THE WITNESS:  Okay.

24             THE COURT:  Thank you.

25             Please proceed.

```
 1                    MS. BRENNAN:  Thank you.

 2                       (Colleen Beltran)

 3                      DIRECT EXAMINATION

 4    BY MS. BRENNAN:

 5    Q.  Ms. Beltran, what is your current occupation?

 6    A.  I am on disability.

 7    Q.  Okay.  I'm going to take you back a couple years to

 8    December 2014.  Do you remember where you were working then?

 9    A.  December of 2014 I was working at Gateway Commons.

10    Q.  And what is Gateway Commons?

11    A.  It's an apartment complex.

12    Q.  In Brooklyn Center?

13    A.  That's correct.

14    Q.  What was your job at the Gateway Commons Apartments?

15    A.  I was a leasing agent.  I was a cleaner, a caretaker.

16    Miscellaneous.

17    Q.  How long did you work there?

18    A.  Since 2009 to February 2015.

19    Q.  Talking about your leasing agent responsibilities at

20    Gateway Commons, what did you do as a leasing agent there?

21    A.  People would call and make appointments to come in and

22    see if we had any one- or two-bedroom apartments, and I'd

23    set those up and then they would come in.

24    Q.  And would you show the apartments?

25    A.  Yes.
```

1   Q.  And then if someone indicated that they wanted to rent

2   one of the apartments, what would you do?

3   A.  I'd give them an application, tell them there was a $30

4   application fee, to get it in as soon as possible if they

5   were really interested.

6   Q.  And what would you -- would you collect any documents

7   from the person who was applying for the apartment?  I

8   assume there was an application they would fill out,

9   correct?

10  A.  Yes.  If they stayed and filled out the application and

11  they paid the $30, then I'd ask for a driver's license,

12  Social Security, and take copies of them and put them with

13  their application with the application check.

14  Q.  Okay.  And then would you -- were there any other types

15  of documents that you would ask people for when they were

16  renting an apartment?

17  A.  Yes.  They would need to also bring in two of their most

18  recent pay stubs, bring them in or fax them.

19  Q.  Okay.  Do you recall an incident around that time

20  involving a person by the name of Michael Saydee?

21  A.  Yes.

22  Q.  And what do you recall about that?

23  A.  He came in as a walk-in.  Didn't call for an appointment

24  or anything, just as a walk-in.

25  Q.  Okay.

```
 1    A.  And said he was interested in a two-bedroom apartment.

 2    Q.  Do you remember about when this Michael Saydee person

 3    came in?

 4    A.  Let me think.  I think it was either July or August.

 5    Q.  Okay.  So did you end up renting an apartment to a

 6    person who identified themselves as Michael Saydee?

 7    A.  Yes.

 8    Q.  Okay.  And did something happen later that is the reason

 9    why you would remember this person among all the hundreds of

10    people that you rented apartments to?

11    A.  Yes.  I got into a lot of trouble.

12    Q.  What happened later that caused you to get into trouble?

13    A.  A gentleman and quite a few family members came in and

14    went into the manager's office and he was the real Michael

15    Saydee.

16    Q.  Who was the manager at that time?

17    A.  Mindy Brummer.

18    Q.  So was Mindy -- would that have been your boss?

19    A.  Yes.

20    Q.  Were you there when Michael Saydee and his family

21    members came in?

22    A.  Yes.

23    Q.  Okay.  And what was happening?  What was -- well, first

24    of all, this person comes in, right?

25    A.  Yes.
```

1    Q.  And what's he saying to Mindy?

2    A.  They were screaming.  She shut the door.  They were

3    going back and forth and that he had all this documentation

4    stating that he was the real --

5              MR. MORRISON:  Objection, hearsay.

6              THE COURT:  Could you lay further foundation

7    for --

8              MS. BRENNAN:  Sure.

9    BY MS. BRENNAN:

10   Q.  You heard commotion in the room, correct?

11   A.  Yes.

12   Q.  Okay.  And afterwards did you -- did Mindy ask you if

13   you recognized the man who was in there?

14   A.  Yes.

15   Q.  And what did you say?

16   A.  No.

17   Q.  And she told you that that was the guy who said he was

18   Michael Saydee, right?

19   A.  Yeah.

20             MR. MORRISON:  Objection, hearsay.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.

23   BY MS. BRENNAN:

24   Q.  Okay.  And you remember seeing this guy who came in and

25   was raising a commotion in the office?

```
 1    A.  Vaguely.

 2    Q.  Do you remember looking at him and having any

 3    recollection about whether you had seen him before or rented

 4    him an apartment?

 5    A.  No.

 6    Q.  Is he the person that you had rented the Michael Saydee

 7    apartment to?

 8    A.  No.

 9    Q.  And did you tell that to Mindy?

10    A.  Yes.

11    Q.  Now, Mindy was the manager.  Was she the manager of the

12    entire apartment complex?

13    A.  Yes.

14    Q.  Okay.  Do you remember sometime after that day, maybe a

15    week or ten days later, do you remember meeting with Special

16    Agent Flint?

17    A.  Yes.

18    Q.  And do you remember what happened or what you talked

19    with Special Agent Flint about?

20    A.  Yeah.  He asked me some questions and if I could point

21    out or recognize who Michael Saydee was.

22    Q.  Uh-huh.  And did you do that?

23    A.  Yes.

24    Q.  Did he show you some photographs?

25    A.  Yes.
```

1    Q.  And were you able to point out who you believed --

2    A.  Who I believed was Michael Saydee, yes.

3    Q.  And that person was not the same person who had come in

4    to the apartment and had the altercation or the conflicts

5    with Mindy, right?

6    A.  Yes.

7    Q.  Okay.  Thank you, Ms. Beltran.

8           MS. BRENNAN:  I don't have any further questions.

9           THE COURT:  Mr. Morrison.

10                      **CROSS EXAMINATION**

11   BY MR. MORRISON:

12   Q.  Ms. Beltram?

13   A.  Beltran.

14   Q.  Beltran.  I'm sorry.  Aaron Morrison is my name.  We've

15   never met before?

16   A.  No.

17   Q.  Okay.  Just a quick couple of questions.

18           When the Secret Service agent came to do a

19   follow-up interview of you, he showed you a photograph of --

20   do you know who it was?

21   A.  No.  I didn't know who the men were that he showed me,

22   but I pointed out and stated that's who I thought --

23   Q.  And how many photographs did he show you?

24   A.  I think there were two or three.  I can't remember.

25   Q.  Okay.  Two or three.  There weren't a whole lot of them?

1    A.  No.

2    Q.  Wasn't a lineup of four or five people at the top and

3    four or five people at the bottom?

4    A.  Not that I can remember, no.

5    Q.  Okay.  And you also were shown a photograph, if you

6    recall, of a gentleman by the name of James Capehart.  Do

7    you recall that?

8    A.  Not really, no.

9    Q.  Okay.  Do you recall --

10             THE COURT:  Ms. Beltran, I'm going to ask you to

11   speak up just a little bit more.  Sometimes your voice is

12   getting muffled.

13             THE WITNESS:  Okay.  Sorry.

14             THE COURT:  Thank you.

15   BY MR. MORRISON:

16   Q.  Do you recall that you did identify that there was

17   another individual that had come in with who you believed

18   was Mr. Saydee to rent the apartment; do you recall that?

19   A.  Yes.

20   Q.  And you were able to identify him in one of the photos

21   as well?

22   A.  That's correct.

23   Q.  Of the two or three photos that were presented?

24   A.  That's correct.

25   Q.  Thank you.  I have no other questions.

1     A.  Thank you.

2              THE COURT:  Ms. Brennan, anything by way of

3     redirect?

4              MS. BRENNAN:  No, Your Honor.

5              THE COURT:  Ms. Beltran, you can step down.

6              Call your next witness.

7              MS. BRENNAN:  Your Honor, the government calls

8     Mike Peterson.

9              THE COURT:  Please step forward.  Raise your right

10    hand.

11        (Witness sworn)

12             THE COURT:  Please be seated.  And after you get

13    settled in, please state your full name, spell your last

14    name, and also tell me what your title is.

15             THE WITNESS:  Michael Peterson, P-e-t-e-r-s-o-n.

16    I am a police officer with the City of Brooklyn Center.

17             THE COURT:  Please go ahead.

18             MS. BRENNAN:  Thank you.

19                       **(Michael Peterson)**

20                       **DIRECT EXAMINATION**

21    BY MS. BRENNAN:

22    Q.  Officer Peterson, how long have you been a police

23    officer in the city of Brooklyn Center?

24    A.  A little over 11 years.

25    Q.  Are you familiar with the Gateway Apartments?

1   A.  Gateway Commons Apartments complex, yes.

2   Q.  Yes.  I'm going to take you back to December of 2012.

3   Do you recall responding to a call for service at the

4   Gateway Commons Apartments around that time?

5   A.  I went there numerous times.  If it's in reference to

6   that report, it was 2014, I believe.

7   Q.  Sorry.

8   A.  No problem.

9   Q.  I apologize.  December of 2014 and you say in reference

10  to the report.  You understand you're here today about an

11  incident involving, among other folks, a person named

12  Michael Saydee?

13  A.  Yes.

14  Q.  Can you describe what -- first of all, do you recall

15  what day you got the original call or this whole thing

16  started from your perspective?

17  A.  On December 1st we were called about an identity theft

18  that was occurring at that apartment complex by a Michael

19  Saydee.

20  Q.  Okay.  And you say, "by a Michael Saydee."  Is Michael

21  Saydee the person who called you?

22  A.  Correct.

23  Q.  Okay.  And did you -- so you then responded to the

24  apartment complex?

25  A.  First we spoke with him over the phone, kind of got a

1    little understanding of what he was talking about, and then

2    I directed him to meet us at the manager's office so we

3    could really figure out what was going on.

4    Q.  Okay.  And what is the gist of what was happening at

5    that time?

6    A.  He stated that he was moving into a new apartment

7    elsewhere in Brooklyn Center.  He was trying to put the

8    electricity bill in his name at that apartment complex.  The

9    power company told him that he could not do that because he

10   already had a different apartment in a different complex

11   with power on it at that complex.

12   Q.  Okay.  And so you took a report from him that was his

13   complaint of what?

14   A.  His complaint was that somebody used his name to rent an

15   apartment and to put the utilities in that apartment under

16   his name, but he never lived there and he had never been to

17   that apartment complex before.

18   Q.  Okay.  And at that time did you do anything to, you

19   know, investigate his complaint on that first day?

20   A.  I talked to management to see what type of paperwork

21   they had.  Because he was alleging that he was not the one

22   who rented it, but all the paperwork she had was in his

23   name --

24   Q.  Yes.

25   A.  -- he agreed to allow any paperwork that she had with

1    his name on it to be seen by me, so basically a data

2    practices privacy disclosure.  He allowed us to see what was

3    in her file and she showed me an identification card that

4    had his name on it, but the picture was too blurry for me to

5    really see or make an identity of anyone that was on that

6    ID.

7    Q.  Okay.  So it was Michael Saydee's driver's license?

8    A.  Yes, correct.

9    Q.  But you couldn't really see the photo --

10   A.  I couldn't.

11   Q.  -- because it was a Xerox?

12   A.  Yeah, it was a Xerox, a bad Xerox copy.

13   Q.  Okay.  Did you get called -- that first day you were

14   there, December 1st of 2014, did you go into the subject

15   apartment?

16   A.  I do not recall that I did.

17   Q.  Okay.  Do you remember getting called back to the

18   Gateway Commons Apartments regarding this same incident?

19   A.  I do.  The following Friday, which would have been

20   December 5th, the apartment manager, Mindy, called me

21   specifically because she knew that we were dealing with this

22   specific apartment and said, You know, I think something

23   weird is going on here.  We changed the locks to the

24   apartment back on Monday and now it looks like there's some

25   fresh pry marks around the doorknob.  Can you come take a

```
1     look at it and see what's going on?

2     Q.  Okay.  And what do you mean by "pry marks"?

3     A.  It looked as though somebody used a tool of some type --

4     it was hard to tell if it was a screwdriver or a small

5     crowbar -- to try and wedge the door open and get into a

6     secured apartment.

7     Q.  Okay.  And was it your understanding from the manager --

8     this was Mindy, correct?

9     A.  Correct.

10    Q.  You've dealt with Mindy in the past?

11    A.  Yeah.  I have a working relationship with Mindy based on

12    other assignments that I've had with the City of Brooklyn

13    Center.

14    Q.  Okay.  That she had changed the locks on the apartment?

15    A.  That was my understanding, correct.

16    Q.  Okay.  So at this point on December 5th, what did you do

17    after speaking with Mindy?

18    A.  Because she was concerned that somebody was either going

19    to be possibly staying in the apartment over the weekend and

20    could either steal whoever's property was in there, because

21    she really didn't know who rented the apartment and she

22    didn't want her apartment damaged, she asked that we go make

23    sure that there was nobody in the apartment so then she

24    could go in and take a look at the apartment again, make

25    sure there was no damage.  So if anything happened over the
```

1    weekend, then she'd have to call us and file another report.

2    Q.  And at this point you had been doing -- were you doing

3    some investigation as sort of an identity theft case or was

4    this an open investigation on your end?

5    A.  It was an open investigation.  We had completed our

6    report on our previous shifts that we were working.

7    Q.  Yeah.

8    A.  And, you know, from there it can get assigned to a

9    detective or it might not.  During the investigation,

10   though, I had contact with Secret Service regarding the

11   incident.

12   Q.  But at this point did you know who was sort of -- when

13   you went back on December 5th, did you know, like, who is

14   the person who is authorized to be in this apartment, whose

15   apartment is this legitimately?  Did you have those answers

16   at that time?

17   A.  Had none of those answers because the person who was on

18   the lease, Michael, stated that he never rented the

19   apartment and was denying having that apartment under his

20   name.

21   Q.  Okay.  So you went in the apartment?

22   A.  We did.

23   Q.  How did you get in the apartment?

24   A.  The manager, Mindy, had a key, opened the door, and then

25   we made entry into the apartment.

1    Q.  What did you do when you were in the apartment?

2    A.  We did a safety sweep just to make sure that there was

3    nobody in the apartment.  So we looked in places where

4    somebody would be laying or sitting, standing to make sure

5    there was no occupants in there.  And while we did that we

6    were looking for anything of value, in case it did get

7    broken into, that Mindy could either secure or we could

8    secure for her.

9    Q.  Okay.  And did you end up removing anything from that

10   apartment?

11   A.  We did.  The only piece of evidence or anything of value

12   that we saw was a laptop and we wanted to make sure that if

13   the apartment was broken into again over the weekend,

14   whoever's laptop it was wouldn't be stolen.

15   Q.  Okay.  So then did you take the laptop out of the

16   apartment?

17   A.  We did and we brought it back to the Brooklyn Center

18   Police Department, where we inventoried it for safekeeping

19   until somebody would lay claim to it.

20   Q.  Okay.  Did you take anything else out of that apartment

21   that you recall?

22   A.  No.

23   Q.  So what was your plan with respect to this computer once

24   you had it out of the apartment?

25   A.  Wait for somebody to claim it and prove that they owned

1    it and then we would have given it back to them.

2    Q.  Okay.  Now, at some point in here you contacted the

3    Secret Service; is that right?

4    A.  That's correct.

5    Q.  Do you recall how that came about?

6    A.  On the original incident the first day when we were in

7    the apartment manager's office talking to both Michael and

8    Mindy, Michael actually got a phone call from somebody that

9    the person identified themselves as Fester and Michael

10   identified them as Fester.  The phone was on speaker.  I was

11   listening to the conversation.  I identified myself that I

12   was there.  I had known Fester from previous contacts in the

13   city of Brooklyn Center.  And he stated that, yes, he stayed

14   in that apartment from time to time, but it wasn't himself

15   that rented it.

16        Like Michael was saying that there was another

17   individual involved, a James Capehart, who we were never

18   able to identify, but when I ran that name through the

19   computer, it popped up with a warrant as being a fugitive

20   and that's how I got in contact with the Secret Service.

21   Q.  Okay.  And James Capehart turned out to be a fugitive in

22   a federal case, right?

23   A.  Yes, as far as I knew at the time of the incident.

24   Q.  Okay.  But you didn't know anything about James Capehart

25   prior to that time?

1    A.  Nothing.

2    Q.  Okay.  So at the time you called Special Agent Flint,

3    did he then come out to the Gateway Commons Apartments?

4    A.  He did.

5    Q.  Okay.  At the time he got there, had you already been

6    inside the apartment?

7    A.  Yes.

8    Q.  Okay.  So had you already removed the computer from the

9    apartment?

10   A.  I don't think I had removed it, but I had made the

11   decision that I was going to be taking it for safekeeping.

12   Q.  Okay.  And then what did you subsequently do with the

13   computer?

14   A.  It went to our police department, where I inventoried it

15   into our property room, where it remained.

16   Q.  Okay.  And then did anyone contact you to say, Hey,

17   that's my computer, I want it?

18   A.  Fester did contact me by phone and we had contact with

19   him saying that he wanted to get his laptop out.

20   Q.  And what did you tell him?

21   A.  I told him if he was able to provide proof of ownership

22   or that he purchased it, we would gladly release it to him.

23   Q.  Okay.  How long did you -- at some point Special Agent

24   Flint brought a search warrant to you for that computer; is

25   that right?

```
1    A.  Correct.

2    Q.  Okay.  And that was a federal search warrant?

3    A.  I believe so, yeah.

4    Q.  Okay.  About how long had you had that computer before

5    you turned it over to Special Agent Flint to be searched?

6    A.  I believe it was two weeks.  It was like on the 19th we

7    were finally able to meet in person and facilitate

8    transferring it into his custody.

9    Q.  So during that interim time had Mr. Sayonkon, Fester

10   Sayonkon, showed up -- that's who we're talking about,

11   right, Fester Sayonkon?

12   A.  Yes.

13   Q.  Do you recognize Mr. Sayonkon?

14   A.  It's been a long time since I've seen him, so I wouldn't

15   recognize him today.

16   Q.  Okay.  During that interim period had you had

17   conversations with Mr. Sayonkon about the computer?

18   A.  Over the phone, yeah.

19   Q.  Okay.  And had he come into the police department to

20   pick up the computer or had he shown you any proof of

21   ownership of the computer at that point?

22   A.  I never saw any proof of ownership of the computer.  He

23   may have -- we may have had a conversation in our lobby of

24   the police department.  I really don't recall if it was on

25   the phone or in person.  We talked several times between
```

1    December 1st and December 5th.

2    Q.  Okay.  If he had -- if Mr. Sayonkon had shown up with

3    proof of ownership, would you have given him the computer?

4    A.  I would have been compelled to, yes.  He's the owner.  I

5    would have given it over to him.

6    Q.  So were you holding it so that Secret Service could come

7    with their warrant?

8    A.  No.

9    Q.  To your knowledge, did the City of Brooklyn Center ever

10   charge Mr. Sayonkon with stealing Michael Saydee's identity

11   or were there any criminal charges that came out of that

12   particular incident?

13   A.  To my knowledge, no.

14          MS. BRENNAN:  Thank you.  I don't have any further

15   questions.

16          THE COURT:  Mr. Morrison.

17                    **CROSS EXAMINATION**

18   BY MR. MORRISON:

19   Q.  Good afternoon, I guess, Officer Peterson.

20   A.  Good afternoon.

21   Q.  Now, you had contact with a Michael Saydee, true?

22   A.  Correct.

23   Q.  You had contact with him on December 1st?

24   A.  Correct.

25   Q.  That was at the Gateway Commons apartment complex?

1    A.  Correct.

2    Q.  And you, in fact, also had contact with him then on

3    December 2nd; is that fair?  Do you remember a phone call to

4    him?

5    A.  I remember that there was a phone call regarding some

6    video of him being on the property, but I don't recall the

7    exact date that that occurred.

8    Q.  Okay.  And we can -- December 2nd was a phone call where

9    you had some problems with the recording device.  You were

10   attempting to record it.  Does that refresh your

11   recollection?

12   A.  My training officer did, yeah.  I was training an

13   officer who was doing most of the work as I was standing

14   next to him watching.

15   Q.  Okay.  And certainly during that contact -- you had

16   initiated that phone call to Mr. Saydee?

17   A.  To be honest, I don't recall if we initiated it or if we

18   were returning a phone call from him.  I don't recall.

19   Q.  Regardless, you certainly had his phone number at that

20   point?

21   A.  Yes, because we took an initial report from him on the

22   first day that he had called in.  That would have been

23   collected to compile our report on the first day.

24   Q.  Okay.  And one of the issues were you were trying to

25   figure out if Mr. Saydee actually had rented that apartment;

1    fair?

2    A.  Yeah, we were trying to vet his story compared to the

3    story that I heard from Fester over the phone.

4    Q.  Okay.  And one of the questions you asked Mr. Saydee was

5    whether or not he would appear on any of the closed-circuit

6    camera video feed from the Gateway Commons Apartments.  Do

7    you recall that?

8    A.  I do recall that.

9    Q.  Okay.  Now, at least you knew that there was additional

10   contact with Mr. Saydee in the Gateway Commons apartment

11   complex regarding this video, you know that, right?  Let me

12   back up.  On 12-5 when you responded to Gateway Commons --

13   A.  Okay.

14   Q.  -- and did the search --

15   A.  Yep.

16   Q.  -- you learned at that time that Mr. Saydee had

17   contacted the manager, Ms. Brummer?

18   A.  Yes.

19   Q.  And he was -- he contacted her and he was frantic is the

20   way she described it?

21   A.  As the way she described it to me, yes.

22   Q.  And he was concerned whether or not he would appear on

23   any of the video at Gateway Commons?

24   A.  Prior to the phone call that he made to us on

25   December 1st, yes, that's the impression I got from Mindy,

1    is that he appeared nervous or frantic that there would be

2    some other video of him out there.

3    Q.  Okay.

4    A.  When I confronted him on that later, he said that there

5    wouldn't be.

6    Q.  Sure.  But at least on December 5th he was pretty

7    worried about that and frantic about that, according to

8    Ms. Brummer?

9    A.  It seemed that way according to her, correct.

10   Q.  Okay.  Now let's go back to December 1st again on this

11   initial call.  While you were still at the Gateway Commons

12   complex, the phone call came in to -- was it Ms. Brummer

13   from Mr. Sayonkon?

14   A.  No.  It was to Michael Saydee's cell phone.

15   Q.  To Michael Saydee's cell phone?

16   A.  Correct.

17   Q.  So it's you and the officer you were training, Officer

18   Smith?

19   A.  Correct.

20   Q.  Mr. Saydee was there?

21   A.  Correct.

22   Q.  Anybody else around the phone at that time?

23   A.  Ms. Brummer and there's another female in there that --

24   we never identified her.  I believe she is a family member.

25   Q.  Okay.  And during that conversation on the phone you

1   learned that, according to Mr. Sayonkon, that that apartment

2   had been rented by Mr. Saydee?

3   A.   No.   He stated that it was rented by James Capehart

4   using Mr. Saydee's name.

5   Q.   Okay.   And that Mr. Sayonkon was staying there and

6   basically subletting the apartment for 450 bucks a month?

7   A.   Yeah, he was saying that he was paying $450.   I wouldn't

8   necessarily say subletting, he didn't allude to that, but

9   more he would stay there from time to time.

10  Q.   Okay.   And whether or not it was on the phone call on

11  12-1 or the subsequent phone calls with Mr. Sayonkon over

12  the course of the next few days, you also learned that, at

13  least according to Mr. Sayonkon, Mr. Saydee was upset

14  because he, according to Mr. Sayonkon, wasn't getting paid

15  everything he was owed on the apartment.   Do you recall

16  that?

17  A.   I recall, yes, that somebody was not happy that they

18  were receiving their money, therefore they were making

19  allegations of identity theft.

20  Q.   Okay.

21          THE COURT:   I'm sorry.   Making allegations of

22  what?

23          THE WITNESS:   Identity theft.

24  BY MR. MORRISON:

25  Q.   Now, on 12-5 you get called again by Ms. Brummer to come

1    to the apartment complex?

2    A.  Correct.

3    Q.  And certainly on 12-1 you hadn't gone into the

4    apartment?

5    A.  Correct.

6    Q.  You didn't receive any consent from Mr. Saydee to search

7    the apartment?

8    A.  Correct.

9    Q.  On 12-2 when you spoke with Mr. Saydee and confronted

10   him about the potential of the video, he didn't provide any

11   consent to you to search the apartment, true?

12   A.  I never asked him to search the apartment because on

13   previous contacts he stated it was not his apartment.

14   Q.  Okay.

15   A.  Therefore under Ms. Brummer's eyes it was not rented.

16   Q.  Okay.  And now you go on 12-5 to the apartment complex

17   and Ms. Brummer has changed the locks?

18   A.  Correct.

19   Q.  She nevertheless doesn't feel she can enter the

20   apartment; is that your feeling on it?

21   A.  Yes.  Based on the history and the proximity of the

22   apartment complex to some other high-crime areas, she did

23   not feel safe going in there by herself.

24   Q.  Okay.  And you didn't call Mr. Saydee on 12-5 to ask for

25   permission to search the apartment?

1    A.  I did not because Ms. Brummer believed that nobody was

2    currently a tenant in there after Mr. Saydee was in the

3    office saying he did not rent it.

4    Q.  Okay.  She had changed the locks, though, so she had

5    been in presumably at some point to do that?

6    A.  Maintenance, I believe, was in there the same day that

7    Mr. Saydee made the report to us and to her.

8    Q.  Okay.  And you came up to the apartment.  The door

9    wasn't broken open, there were pry marks, but it was closed

10   and locked and secured; fair?

11   A.  Correct.

12   Q.  And nevertheless you entered the apartment?

13   A.  Correct.

14   Q.  When you were inside of the apartment, there was no

15   signs of a burglary that had occurred?

16   A.  It didn't appear so, no.

17   Q.  Okay.  There was a computer, in fact, out on a table?

18   A.  Correct.

19   Q.  Nevertheless, you still had concerns about a theft in

20   the unit?

21   A.  We did because we saw the pry marks on the front door,

22   thinking maybe somebody would try again over the weekend.

23   And Officer Smith found a window that was unlocked, but

24   secure.  So it wasn't pushed up, the screen was still there,

25   but we weren't sure if maybe somebody would attempt to get

```
1     in over the weekend from that point as well.

2     Q.  And you, in fact, secured that window --

3     A.  We did.

4     Q.  -- closed it and locked it?

5     A.  Correct.

6     Q.  And prior to this 12-5 you had spoken with Secret

7     Service about Mr. Capehart?

8     A.  Correct.

9     Q.  You knew that there was allegations of identity theft

10    related to Mr. Capehart; fair?

11    A.  I knew there were allegations in our investigation

12    regarding identity theft.

13    Q.  And you had at least created enough of a contact with

14    the Secret Service that on December 5th when you seized this

15    computer, you called the Secret Service agent and had them

16    respond to the scene as well?

17    A.  Correct.

18            MR. MORRISON:  Just a moment, Your Honor.

19            THE COURT:  Sure.

20        (Pause)

21    BY MR. MORRISON:

22    Q.  And, in fact, you learned, Officer Peterson, from

23    Ms. Brummer that the rent on that apartment was current?

24    A.  Correct.

25    Q.  Thank you, Officer.  I don't have any other questions.
```

1    A.  Thank you.

2         THE COURT:  Ms. Brennan, any redirect?

3                    **REDIRECT EXAMINATION**

4    BY MS. BRENNAN:

5    Q.  Officer Peterson, do you remember the first time you

6    talked to Secret Service about this case, if it was the day

7    that Special Agent Flint came out?

8    A.  I believe I talked to him on the first day that I was

9    out there on December 1st.  I remember learning about the

10   James Capehart.  I don't know if I contacted him or he

11   contacted me, and I honestly don't remember what day that

12   was.

13   Q.  Okay.  Do you recall the day that Special Agent Flint

14   came out to the Gateway Commons Apartments, was that in

15   response to you calling him or him calling you?

16   A.  I called him.

17        MS. BRENNAN:  Thank you.

18        MR. MORRISON:  Nothing, Your Honor.

19        THE COURT:  All right.  You may step down.

20        THE WITNESS:  Thank you.

21        MS. BRENNAN:  Your Honor, I have one more witness.

22   Would you like to keep going?

23        THE COURT:  How long do you anticipate you would

24   go with that witness?

25        MS. BRENNAN:  Ten minutes.

Bonesteel - Direct

1    (The Court and court reporter confer)

2         THE COURT:  It sounds like our intrepid court

3    reporter is willing to play along, so go ahead and call

4    your -- and this will be your last witness?

5    (Pause)

6         THE COURT:  You anticipate this will be your last

7    witness, Ms. Brennan?

8         MS. BRENNAN:  Yes, Your Honor.  Sorry.  I was

9    having trouble multitasking for a moment there.

10        The government calls Paul Bonesteel.

11        THE COURT:  Before you sit down, I will have you

12   raise your right hand.

13   (Witness sworn)

14        THE COURT:  Please sit down and after you're

15   settled in, please state your full name, spell your last

16   name, and tell me your position.

17        THE WITNESS:  First name is Paul, P-a-u-l, John,

18   J-o-h-n, Bonesteel, B-o-n-e-s-t-e-e-l.  I'm a police officer

19   with the City of Columbia Heights.

20        THE COURT:  Ms. Brennan, go ahead.

21        MS. BRENNAN:  Thank you.

22                        **(Paul Bonesteel)**

23                      **DIRECT EXAMINATION**

24   BY MS. BRENNAN:

25   Q.  Officer Bonesteel, how long have you been a police

1     officer with the City of Columbia Heights?

2     A.  A little over 22 years.

3     Q.  Are part of your duties as a Columbia Heights police

4     officer, does that include patrolling the city of Hilltop?

5     A.  Yes, it does.

6     Q.  Where is Hilltop?

7     A.  Hilltop is right in the center of Columbia Heights.

8     It's five blocks by probably four blocks, but right in the

9     middle of, right in the heart of Columbia Heights.

10    Q.  Okay.  Are you familiar with the Starlite Motel?

11    A.  Yes, I am.

12    Q.  Where is that?

13    A.  4720 Central Avenue Northeast, Hilltop.

14    Q.  You're familiar with Saddam Samaan, the person who is

15    involved in this case?  That's what you are here about

16    today, right?

17    A.  That is correct.

18    Q.  Do you recall an incident that involved Mr. Samaan

19    originating at the Starlite Motel?

20    A.  Yes, I do.

21    Q.  First of all, do you recall when that happened?

22    A.  When I first came upon this case was October 14, 2012.

23    I actually had contact with him on August 15, 2012.

24    Q.  August 14th or October 14th?

25    A.  August.

1    Q.  Okay.  Of 2012, that was the first --

2    A.  That is correct.

3    Q.  That's when this started --

4    A.  Correct.

5    Q.  -- from your perspective?

6    A.  Yes.

7    Q.  Okay.  So on August 14th of 2012, what happened?

8    A.  I was working our safe streets unit in the city of

9    Columbia Heights.

10   Q.  What is a safe streets unit?

11   A.  To explain it, it's a little bit different from patrol.

12   So patrol is kind of our reactionary unit that revolves

13   around responding to 911 calls for service.  The street

14   crimes unit consists of myself and one other officer at the

15   time.  It was Officer Pletcher.  It's more of a proactive

16   unit and we kind of target either problem properties,

17   problem addresses, and/or problem people.

18   Q.  Okay.  And so on that day you went to the Starlite

19   Motel.  You were not responding to a call for service; is

20   that correct?

21   A.  That is correct.

22   Q.  Okay.  So what was your purpose of going to the Starlite

23   Motel?

24   A.  As part of our everyday police cooperation that we have

25   with the Starlite Motel, we respond there and get a copy of

1    the guest registry of the guests that are staying at their

2    motel.

3    Q.   Okay.  And you say, "We respond there," but you weren't

4    responding to a call, you just went there, right?

5    A.   That is correct.

6    Q.   Okay.  And you said you get a copy of the guest

7    registry?

8    A.   That is correct.

9    Q.   Now, is that because you would request that from the

10   motel?

11   A.   Yes, it is.

12   Q.   And that's what happened on August 14th of 2012?

13   A.   That is correct.

14   Q.   Did the clerk give you a copy of the guest registry?

15   A.   The clerk gave me -- at the time they were making copies

16   of everybody that walked in that rented a room, either a

17   copy of their driver's license, their state ID card, or

18   whatever identification they would have for the person

19   staying there renting a room.

20   Q.   Okay.  So the clerk -- is there an actual registry

21   document that you would get or would there be a list of

22   names of people or how --

23   A.   On that occasion they gave me a copy, like either they

24   scanned it or they made a copy of the actual driver's

25   license or identification card that was used to rent the

1     room.

2     Q.  Okay.  But I'm wondering:  Did you also get a list of

3     people who were renting rooms there, some kind of a list of

4     the person and the room number, or what would you get

5     besides a copy of the identification?

6     A.  Generally what they'll do is they'll give us a list that

7     will have their ID and then what room they're renting.

8     Q.  Okay.

9     A.  On that day in question they gave me a copy of everybody

10    that was currently staying in the motel and how they were

11    identified.

12    Q.  Okay.

13    A.  But as for a specific list that lists all names and

14    addresses, phone numbers, stuff like that, it wasn't.  It

15    was a copy of their driver's license or identification card

16    that they used to rent the room and then it said what room

17    they were in.

18    Q.  Okay.  So it would be like a copy of a driver's license

19    and the room number written down?

20    A.  Correct.

21    Q.  Fair to say the Starlite Motel doesn't necessarily have

22    the most sophisticated recordkeeping system?

23    A.  Very fair to say, yes.

24    Q.  Okay.  So this is August 14th of 2012 and this is what

25    you would have been provided at that time, right?

```
1    A.  Yes.

2    Q.  Okay.  What did you do -- you had gone, you testified

3    that you had -- this was something you frequently asked the

4    Starlite Motel to provide, right?

5    A.  That is correct.

6    Q.  And that was before August 14th of 2012 and since

7    August 14th of 2012, correct?

8    A.  Absolutely, yes.

9    Q.  Okay.  And what is the reason that you would request

10   this information from the Starlite Motel?

11   A.  The Starlite generally is -- we consider it a hot spot

12   in our community, which means it's been identified as

13   creating or having a lot of calls, police calls, for service

14   there, whether they include domestic calls, whether

15   prostitution, narcotics, stolen vehicles.  We seem to get

16   called there typically more than we do most other businesses

17   in our community.

18   Q.  Okay.  And is it a motel that's -- is it a lower cost

19   motel?

20   A.  I would say it is, yes.

21   Q.  Okay.  So when you get the registry, what are you

22   looking for?  What are you going to do when you get that

23   registry?

24   A.  Once I obtain the registry, I will take the information

25   and I'll bring it to my squad car where I have a computer.
```

1    I will process, meaning I will enter all information that I

2    have regarding the person renting the room into our database

3    just to see what type of contacts we've had with them.

4    Sometimes it will tell me whether they have warrants for

5    their arrest, whether there is a probable cause pickup for

6    them, whether there's a restraining order that prevents them

7    from having contact with somebody.  So it gives me a wide

8    variety of knowledge on who is renting the room.

9    Q.  Okay.  And so focusing now on Mr. Samaan, did you get an

10   ID card that said Saddam Samaan on it?

11   A.  No, I did not.

12   Q.  Okay.  Do you recall the name of an ID card that you

13   received from the motel clerk?

14   A.  I'd have to refer to my notes if that's okay.

15   Q.  Sure.

16   A.  Okay.  The name that was given to me or provided to me

17   was on a Minnesota ID card, Daoud Samaan -- and I don't know

18   how to pronounce the last name -- Alseman, date of birth

19   3-31 of '58.

20   Q.  Okay.  So it was a Minnesota ID card with that name on

21   it, right?

22   A.  That is correct.

23   Q.  And can you describe what you did, then, when you got

24   that Minnesota ID card.  Same thing you've already testified

25   about?

```
1    A.  Yeah.  I would have run the ID number, the Minnesota

2    state ID number, in our database.

3    Q.  Do you recall what happened when you ran that ID card in

4    your database?

5    A.  I do.  It came back not on file.

6    Q.  Did you do anything else at that point to try to verify

7    that ID card?

8    A.  Yes.  I re-entered it again just to try it a second time

9    because maybe I entered it wrong.  Upon doing it the second

10   time, it came back not on file once again.  At that point I

11   went into the Department of Motor Vehicle website where you

12   can enter partial names.  So at that point I entered the

13   name that was on the identification card and again it came

14   back not on file.

15   Q.  Okay.  So at this point as a police officer, what are

16   you -- what do you believe has happened?

17   A.  Obviously that the person that rented the room presented

18   a fraudulent ID card to the clerk in order to obtain a room.

19   Q.  Okay.  So from that point on did you take further steps

20   to investigate who that person might have been?

21   A.  I did.  Myself and Sergeant Matt Markham knocked on the

22   door, attempted to make contact with the renter to find out

23   what was going on.  We did not get any answer at the door.

24   Q.  Okay.  And this is the renter of the room at the motel,

25   right?
```

1    A.  That is correct.

2    Q.  Did you then subsequently find out who you thought the

3    actual person was?

4    A.  Yes.  As part of my investigation and the other person

5    that I was working with, who is a little bit more computer

6    savvy than I am, I proceeded to explain what was going on,

7    at which point he entered the name in a database and came up

8    with the person he believed that actually passed the ID.

9    Q.  Okay.  And who did he identify as the person?

10   A.  He identified -- I'll have to refer to my notes so I get

11   the name correct here -- Saddam Samaan Daoud Samaan.

12   Q.  Okay.

13   A.  Date of birth 4-14 of '77.

14   Q.  Okay.  So that's who you ended up thinking this was, the

15   actual renter of the hotel room was?

16   A.  Yeah.  I remember Officer Pletcher had showed me a

17   picture, a driver's -- it was either a driver's license

18   picture, I guess I don't remember, or through the Minnesota

19   MRAP, which shows booking photos, and the photo, as I

20   remember, matched that of the ID that was on the fraudulent

21   ID card that was used to obtain a room.

22   Q.  Okay.  And did you learn anything when you did look to

23   see -- when you're looking at this photograph of Saddam

24   Samaan, did you learn anything about Saddam Samaan with

25   respect to his driving privileges?

Downloaded from Freestad

1    A.  I learned that he was driving after cancelation,

2    inimical to public safety, and I believe it had stemmed from

3    an incident that occurred in a different county in the past.

4    Q.  Okay.  So subsequent to discovering this information,

5    what did you do?

6    A.  We set back up at the Starlite Motel the following day,

7    so on August 15th, and I had -- prior to doing that I had

8    talked to the staff and had learned that a car was involved

9    that was parked that registered with Apartment -- or Hotel

10   Room or Motel Room 131.  I learned that it had a 21-day

11   permit.  Upon coming back that following day on the 15th, I

12   noticed the vehicle was parked directly in front of

13   Room 131.

14   Q.  Okay.  And then you watched to see if anyone would get

15   in that vehicle and drive away, right?

16   A.  That is correct.

17   Q.  And did you subsequently observe Mr. Samaan or who you

18   came to confirm was Mr. Samaan getting in the car and

19   driving away?

20   A.  Yes, I did.

21   Q.  And you initiated a traffic stop, right?

22   A.  I got behind the vehicle.  It pulled into a parking spot

23   a few blocks down the road.  And as I pulled up I hit my

24   horn, because he was getting out, in order to get his

25   attention.  I don't remember if I activated my emergency

CASE 0:16-cr-00265-ADM-HB

1   lights at that time or not, but then I confronted him.

2   Q.  Okay.  And you spoke to him at that point?

3   A.  That is correct.

4   Q.  Now, I don't think everything that happened from that

5   point on is relevant here today, but is it fair to say that

6   following your interaction with Mr. Samaan you ended up

7   arresting him, you got a search warrant for the hotel room,

8   and you towed the vehicle; is that right?

9   A.  That is correct.

10  Q.  And then you subsequently got a search warrant for the

11  vehicle as well?

12  A.  Just for the hotel room.

13          MS. BRENNAN:  I don't have any further questions.

14  Thank you.

15          THE COURT:  Mr. Wolf.

16          MR. WOLF:  Yes, Your Honor.  Thank you.

17                      **CROSS EXAMINATION**

18  BY MR. WOLF:

19  Q.  Good afternoon, Officer.

20  A.  Good afternoon.

21  Q.  Okay.  Let me get organized here for a second.  I

22  appreciate that.

23          So on August 14th of 2012 you stopped at the

24  Starlite Motel in Columbia Heights to perform an inspection

25  of a hotel registry, correct?

CASE 0:16-cr-00265-ADM-HB

```
 1    A.  That is correct.
 2    Q.  And how many -- what period of time had you been doing
 3    that prior to August 14th of 2012?
 4    A.  I would say it's difficult to answer, but it probably
 5    goes back at least a year not only by me, but kind of an
 6    expectation of our department that someone will pick it up
 7    on a daily basis.
 8    Q.  Okay.  And that's the practice of your department, to
 9    inspect the hotel registry on a daily basis, correct?
10    A.  At the time, yes.
11    Q.  All right.  And subsequently to August 14th of 2012 how
12    long did that practice keep going?
13    A.  I'm sorry.  You said after?
14    Q.  Right.  We talked about before August 14th.  Now, how
15    long did it go after August 14th of 2012?
16    A.  Difficult for me to answer.  I'm assigned to a different
17    unit right now.  I would say 2012, probably easily into
18    2013, 2014, but I don't know that for sure because I'm
19    not -- I'm assigned to a different unit right now.
20    Q.  Did the form of the registry over that period of time
21    ever change?
22    A.  It has changed, yes.
23    Q.  How long were you -- you described the documents you
24    were given and to you did that satisfy the requirement that
25    a hotel or motel has to provide a hotel registry any time
```

Downloaded from SCOTUSblog.com

1    law enforcement requests it?

2    A.  I think for the most part, yes.  Over the years it

3    changes.  Sometimes the copier is down and there's things

4    that happen, but I think in good faith they've made an

5    effort to provide that upon request.

6    Q.  And you know that when a guest registers at the Starlite

7    Motel or any other hotel in your city, they are required to

8    furnish the necessary information required by the hotel or

9    motel to register, correct?

10   A.  That's correct.

11   Q.  And if they fail to do that, if the guest fails to do

12   that, that's a crime, isn't it?

13   A.  Yes, it is.

14   Q.  And you know that, in addition, the motel or hotel

15   personnel, clerks, what have you, are required upon your

16   request to give you the hotel registry records, correct?

17   A.  That is correct.

18   Q.  And if they don't do that, that is also a crime,

19   correct?

20   A.  Yes.

21   Q.  So there's no requirement of probable cause to look at

22   these records, correct?

23   A.  Correct.

24   Q.  There's no requirement of reasonable suspicion of a

25   particularized crime that has occurred, is occurring, or

Downloaded from reesereport.com

104

1    will occur, correct?

2    A.  Correct.

3    Q.  There's no requirement of consent, correct?

4    A.  Correct.

5    Q.  There's no requirement that an officer see a crime

6    occurring in plain view, so to speak, correct?

7    A.  Can you rephrase that?

8    Q.  Yeah.  There's no requirement that -- I don't know.

9    You're pursuing a bank robber.  You know the car is parked

10   in front of the motel and so you're going to look at the

11   records.  You don't have to have sort of like a plain view

12   visual sighting of evidence of a crime, correct?

13   A.  Correct.

14   Q.  And you do not have to request a search warrant,

15   correct?

16   A.  At the time, no.

17   Q.  And in this case you did not request a search warrant,

18   correct?

19   A.  In regards to the registration, I did not.

20   Q.  All right.  And in regards to getting copies of personal

21   data referred -- that you connected to Mr. Samaan, there was

22   no probable cause, correct?

23   A.  Correct.

24   Q.  And there was no reasonable suspicion of a crime,

25   correct?

0:16-cr-00265-ADM-HB
105

1    A.  Correct.

2    Q.  And there was no consent from either the motel clerk or

3    from Mr. Samaan, correct?

4    A.  Correct.

5    Q.  Okay.  The next day on August 15th when you set up

6    surveillance, was it just you or were you accompanied by

7    other officers?

8    A.  Sergeant Markham, I believe, was in the area and Officer

9    Pletcher.  As for how close they were, I don't recall.  But

10   I was specifically in the area watching that vehicle and

11   that apartment and the suspect.

12   Q.  And were you in a marked squad?

13   A.  I was in an unmarked.

14   Q.  And how were you dressed?

15   A.  Plain clothes.  So depending on the weather, it could be

16   like a jacket, it could be just a T-shirt, but I'm not fully

17   marked as a uniformed officer.

18   Q.  No raid vest, that kind of thing?

19   A.  I would have a vest on, but it would be covered up by my

20   clothing or jacket.

21   Q.  All right.  And when you say an unmarked squad, so

22   that's the type of vehicle that would, like, pull me over if

23   I'm speeding and I wouldn't know that that's a police

24   officer until the lights went on, correct?

25   A.  Correct.

Downloaded 25 per PD 0363 AB

1    Q.  All right.  Now, you knew when you began that

2    surveillance on August 15, 2012 that Mr. Samaan had

3    committed at least two crimes, right?

4    A.  Well, I would say, number one, he failed to present

5    proper documentation to the staff at the hotel and then

6    possibly possession of a fraudulent ID card.

7    Q.  And before you pulled him over, you knew that -- lo and

8    behold, right before your eyes he had committed another

9    crime, he was driving a car and he shouldn't have been,

10   correct?

11   A.  Yeah.  He didn't have a valid driver's license, correct.

12   Q.  How long did you follow Mr. Samaan before you

13   encountered him?

14   A.  It was less than two blocks.  The Starlite Motel is

15   4720 Central and he pulled into a parking lot in the 4900

16   block of or 4800 block of -- no, 4900 block of Central, so

17   two blocks.

18   Q.  And can you describe for the Court, how did he park his

19   car?

20   A.  Pulled into a designated parking spot and stopped.

21   Q.  And was the front of his car pointed into like a

22   building or another parked car?  How did that work?

23   A.  It was up against a parking pillar, so it was facing

24   westbound in a parking spot, designated parking spot.

25   Q.  And you decided that it was time for you to encounter

Downloaded from

1    him; is that correct?

2    A.  That is correct.

3    Q.  And how did you position your unmarked vehicle?

4    A.  I don't exactly recall.  I mean, I remember pulling up

5    close enough to him and honked my horn in order to get his

6    attention, at which point I identified myself as a police

7    officer and asked if I could talk to him.  Again, I don't

8    recall if I put on my emergency lights, but I did sound a

9    signal to get his attention.

10   Q.  And you displayed a badge to him?

11   A.  That is correct.

12   Q.  And you parked in such a manner so -- I mean, at that

13   point he was out of his car, correct?

14   A.  That is correct.

15   Q.  However, did you take a precautionary measure to park

16   your car in such a manner that he couldn't re-enter his

17   vehicle and try to flee?

18   A.  As I recall, I was close enough where he probably

19   couldn't back up.

20   Q.  He could not back up?

21   A.  Yeah, I would say that's safe to say.  Could he go

22   forward and flee?  Absolutely, but he didn't do that.

23   Q.  Okay.  He would have to go over like a concrete parking

24   barrier?

25   A.  Correct.

Eovleocase 1 0265 AD

1    Q.  And at this point you and he had a conversation,

2    correct?

3    A.  That is correct.

4    Q.  And at this point if Mr. Samaan had said, Oh, you're a

5    police officer and if he had tried to get into his car and

6    drive away, you would have stopped him, correct?

7    A.  That is correct.

8    Q.  And if Mr. Samaan thought that, well, gosh, I don't have

9    time to get in the car, I can't drive away, if he had

10   started to run away, you would have stopped him, correct?

11   A.  I would have done my best to stop him.

12   Q.  And you honked your horn, displayed your position of

13   authority, and basically Mr. Samaan was seized at that

14   point, correct?

15   A.  Correct.

16   Q.  At no time did you read him a Miranda warning, correct?

17   A.  Correct.

18   Q.  During your interaction with him you found out further

19   incriminating information about Mr. Samaan, true?

20   A.  True.

21   Q.  What kinds of things did you find out?

22   A.  Well, like when I did -- first of all, I asked him for

23   his name.  He proceeded to give me a different name which

24   didn't belong to him.  Also gave me some -- I had asked him

25   if he was, like, staying at the Starlite, which I knew he

1   was.  He, in fact, told me he was not, that he was coming

2   from a different location.  And then ultimately once he was

3   placed under arrest, we ended up doing an inventory tow on

4   the vehicle.

5   Q.  And when you were asking Mr. Samaan for -- you didn't

6   believe him when he said he didn't have an ID, right?

7   A.  That is correct.

8   Q.  And he was fiddling around with his wallet; is that

9   correct?

10  A.  I don't remember him fiddling around with his wallet,

11  no.

12  Q.  Was it a situation where -- you could see a wallet in

13  his pocket, correct?

14  A.  That is correct.

15  Q.  And you told him to take the wallet out of his pocket,

16  correct?

17  A.  Correct.

18  Q.  And when he was -- and when he did that, did you take

19  the wallet from him or did you let him handle the wallet?

20  A.  I remember when he opened up the wallet, that's when I

21  first came across the ID card and I said, There's your ID

22  there.  And I can't remember if at that point I took the

23  wallet or if he handed it to me.  I don't recall.

24  Q.  All right.  But at some point you took possession of his

25  wallet, correct?

Edward Leroy Hoshaw

110

1    A.  Correct.

2    Q.  And in that wallet you found a number of, I guess, fake

3    IDs and maybe some -- we'll get into it specifically, but a

4    number of items that were incriminating, correct?

5    A.  Correct.

6    Q.  Including a number of counterfeit 20 dollar bills?

7    A.  The 20 dollar bills were in his pocket.

8    Q.  I see.  And when did you discover those?

9    A.  After he was placed under arrest.

10   Q.  All right.  But prior to being placed under arrest, as

11   you have testified, he was seized, he couldn't walk away,

12   correct?

13   A.  He was not free to leave, absolutely correct.

14   Q.  Yes, sir.

15        All right.  Now, I just want to go over -- and I'm

16   sorry if this is going to take a little bit of time, I maybe

17   should have tried to stipulate to this, but in your report

18   you detail all the things that were seized from Mr. Samaan's

19   person, his wallet, and his vehicle; is that correct?

20   A.  That is correct.

21   Q.  Now, we're going to go over those just for purposes of

22   the record.

23        Were you involved in seeking search warrants to

24   further investigate some of the things that you initially

25   seized?

Downloaded 265-AD

1    A.  Yeah, I drafted a search warrant for the hotel room or

2    motel room at Starlite.

3    Q.  Okay.  And that was based upon the information you got

4    from the registry and the arrest that followed, correct?

5    A.  Correct.

6    Q.  So if -- do you have a copy of your report, sir?

7    A.  Part of it, yes, I do.

8    Q.  All right.  If you have any questions about what I'm

9    going to lay out on the record here, I would be happy to

10   show you my copy of it.  Okay?

11           All right.  On Mr. Samaan's person you located a

12   Sam's card in the name of Tariq, T-a-r-i-q, M. Bakkry,

13   B-a-k-k-r-y, correct?

14   A.  That is correct.

15   Q.  A TCF Bank Visa card displaying the name of Mariana,

16   M-a-r-i-a-n-a, and I will spell the last name,

17   K-a-r-a-n-y-a-n, correct?

18   A.  Correct.

19   Q.  A Minnesota ID card for Jacob Paul Bean, B-e-a-n,

20   correct?

21   A.  That is correct.

22   Q.  A fraudulent Minnesota ID displaying the name Daoud

23   Samaan Alseman, A-l-s-e-m-a-n, correct?

24   A.  That is correct.

25   Q.  A CP for Saddam Samaan Daoud Samaan, correct?

```
 1    A.  That is correct.

 2    Q.  You know, I had a question on that.  I'm sorry.  I

 3    should know this probably.  What's a CP?

 4    A.  In our world it's constructive possession, so it's

 5    something that would identify -- that would have that name

 6    on it.

 7    Q.  All right.  Thank you, sir.

 8              A Samsung cell phone, T-Mobile, which was in

 9    Mr. Samaan's hand, correct?

10    A.  That is correct.

11    Q.  Did you have a hand in drafting the search warrant to

12    get inside that phone?

13    A.  The actual phone part I did not.

14    Q.  All right, sir.  Counterfeit 20 dollar bills equaling

15    $280; is that correct?

16    A.  That is correct.

17    Q.  The car that he was driving, was it like a Kia Optima,

18    2011?

19    A.  I believe so.  I will have to check my records.  Yeah,

20    it says a 2011 Kia Optima and it had a 21-day permit in the

21    back window.  It didn't have a specific registration license

22    plate on it.

23    Q.  Thank you, sir.

24              From that vehicle you seized a check from Bank of

25    New York made out to Daoud Samaan Daoud Alseman, correct?
```

EXHIBIT 341 - page 60

```
 1    A.  That is correct.

 2    Q.  A check from Bank of New York made out to Rami, R-a-m-i,

 3    Issam, I-s-s-a-m, Alanani, A-l-a-n-a-n-i, correct?

 4    A.  That is correct.

 5    Q.  A check from Bank of New York made out to Daoud Samaan

 6    Daoud Alseman for Rami Issam Alanani, correct?

 7    A.  That is correct.

 8    Q.  A check from Bank of New York made out to Rami Issam

 9    Alanani, correct?

10    A.  That is correct.

11    Q.  Blank checks displaying the name Alseman Trade, LLC,

12    correct?

13    A.  That is correct.

14    Q.  A check from VCVISI, Inc. made out to Rami Issam

15    Alanani, correct?

16    A.  That is correct.

17    Q.  A check from Bank of New York made out to Rami Issam

18    Alanani Amman, A-m-m-a-n, correct?

19    A.  That is correct.

20    Q.  Some evidence of fees paid to the Secretary of State, it

21    looks like maybe incorporation documents, Alseman Trade,

22    LLC, correct?

23    A.  That is correct.

24    Q.  An Acer laptop; is that correct?

25    A.  That is correct.
```

0:16-cr-00265-ADM-HB

114

1   Q.  Did you have any hand in the search warrant that got

2   into that laptop?

3   A.  I did not.

4   Q.  All right.  Thank you, sir.

5           A copy of a residential alien card for Samaan

6   Daoud; is that correct?

7   A.  That is correct.

8   Q.  And then miscellaneous papers, too many to mention, but

9   I guess we have to -- we'll do that later.  It will take a

10  few minutes to do that.  A lot of names involved, correct?

11  A.  That is correct.

12  Q.  And in the front driver door you located one plastic bag

13  with a white residue and it was later tested positive for

14  cocaine, correct?

15  A.  That is correct.

16  Q.  Was that a field test or did that go deeper than that?

17  A.  That would be just a field test.

18  Q.  All right, sir.  Thank you.

19          And that vehicle was then impounded, true?

20  A.  That is correct.

21  Q.  And you then, based upon all the above, all that we've

22  spoken about, obtained a search warrant for the Starlite

23  Motel, Unit 131; is that right?

24  A.  That is correct.

25  Q.  Signed by Judge Hall from Anoka County?

EXHIBIT 441 - 00265-ADM-HB

1    A.  That is correct.

2    Q.  And in that room you seized a Hewlett-Packard printer

3    with power cord, correct?

4    A.  That is correct.

5    Q.  And did you have any hand in any search warrant that got

6    into whatever you could get into on an HP printer?

7    A.  As for the contents, I did not.

8    Q.  Thank you, sir.

9         Also seized a Gateway laptop with a power cord; is

10   that correct?

11   A.  That is correct.

12   Q.  All right.  I think that's all I may have for you, sir.

13   Let me just --

14        MR. WOLF:  If I could have a moment, Your Honor?

15        THE COURT:  Of course.

16   (Pause)

17   BY MR. WOLF:

18   Q.  Thank you, Officer Bonesteel.  Nothing further.

19   A.  Thank you.

20        MR. WOLF:  Thank you, Judge.

21        THE COURT:  Ms. Brennan, any follow-up?

22        MS. BRENNAN:  Just a couple of questions, Your

23   Honor.

24

25

Downloaded from ResearchGate

1        **REDIRECT EXAMINATION**

2    BY MS. BRENNAN:

3    Q.  Officer Bonesteel, you testified in response to

4    Mr. Wolf's questions that you did not have consent from the

5    hotel clerk to get the registry; is that correct?

6    A.  In regards to the hotel, I asked for it and they

7    provided it.

8    Q.  Okay.  Did the clerk indicate any unwillingness or any

9    objection to providing it at that time?

10   A.  No.

11   Q.  Okay.  And of course you testified that state law

12   requires them to provide it, right?

13   A.  That is correct.

14   Q.  When you did stop Mr. Samaan or when you encountered him

15   after he stopped his car, do you recall what type of

16   questions you were asking him at that point?

17   A.  Primarily I was trying to identify him.  Obviously I

18   felt pretty confident on who he was, but I was trying to

19   take that a step forward and verifying that he provided me a

20   false name.

21   Q.  So you asked him several questions about who he was and

22   whether he had an ID and that sort of thing, right?

23   A.  Yep.  And I did ask him about where he was -- or if he

24   was coming from the Starlite, something of that nature, and

25   he said he was not.

Downloaded from ReadPlace

1    Q.  Okay.  Did you ask him any questions about did he commit

2    any kind of financial frauds or any -- was it like a

3    full-scale interview of him?

4    A.  I did not.  I did not interview him.  After he was

5    placed under arrest, I did not ask him any questions.  He

6    was transported to jail on various charges and it was

7    forwarded to our general detectives that would handle the

8    case the following day when they came in.

9    Q.  Okay.  So your questions were who -- related to who he

10   was and whether he was staying at the motel?

11   A.  That is correct.

12           MS. BRENNAN:  Thank you.  No further questions.

13           THE COURT:  Any follow-up?

14           MR. WOLF:  No questions, Your Honor.

15           THE COURT:  Thank you.  You can step down, Officer

16   Bonesteel.

17           THE WITNESS:  Thank you.

18           THE COURT:  Do you have any further witnesses to

19   call, Ms. Brennan?

20           MS. BRENNAN:  I do not, Your Honor.

21           THE COURT:  Do any of the defendants intend to

22   call any witnesses here this afternoon?

23           MS. DURHAM:  No, Your Honor.

24           MR. MORRISON:  No, Your Honor.

25           MR. LE:  No, Your Honor.

1          MR. WOLF:  Not for Mr. Samaan, Your Honor.

2          MR. UDOIBOK:  No, Your Honor, as to Defendant

3   Kromah.

4          THE COURT:  Is there any other -- are there any

5   other exhibits that any of you intend to proffer?

6          MS. DURHAM:  No, Your Honor.  Thank you.

7          MR. MORRISON:  No.

8          THE COURT:  Mr. Le?

9          MR. LE:  No, Your Honor.

10         MR. WOLF:  Mr. Samaan does not, Your Honor.

11         MR. UDOIBOK:  Mr. Kromah does not, Your Honor.

12         THE COURT:  All right.  Thank you.  So we need to

13  talk about briefing.  What I would like to do -- I don't

14  want to drag this out unnecessarily, but I want to think a

15  little bit about a schedule for briefing.  So what I would

16  like to do is take a ten-minute recess.  We won't be more

17  than another ten minutes after that, but I want to take a

18  ten-minute recess and then we'll come back and wrap up the

19  question of briefing, unless -- Ms. Brennan, did you have

20  something other than that to talk about?

21         MS. BRENNAN:  No, Your Honor.

22         THE COURT:  All right.  We're going to take a

23  ten-minute recess.  We'll be back at twenty to 2:00.  Thank

24  you.

25     (Recess taken at 1:35 p.m.)

1              *    *    *    *    *

2        (1:48 p.m.)

3                         **IN OPEN COURT**

4              THE COURT:  Let's talk about briefing.  First, a

5    couple of things just from my perspective.

6              One is by my count with a four-corners review of

7    21 warrants, that's 84 corners to review.  So we'll review

8    them for probable cause, but if any of you on behalf of

9    defendants have something specific to point out, some

10   specific aspect in which you claim probable cause is

11   lacking, some nexus that's missing, I would encourage you to

12   brief it and point it out.

13             Second, if you have any grounds for suppression of

14   anything that is not based on a four-corners review of the

15   search warrant for probable cause, you do have to brief

16   that.  If you don't raise those issues, I will consider them

17   waived.  So you need -- you do need to brief those.

18             And then finally, if you claim anything is the

19   fruit of a poisonous tree, in other words, if you claim that

20   there's a statement that ought to be suppressed if I

21   conclude that probable cause is missing on a four-corners

22   review of a search warrant or, conversely, if you conclude

23   that a search wouldn't have been conducted and that stuff

24   wouldn't have been gathered but for a statement that I

25   should conclude was illegally obtained, you need to identify

1    that in your briefing.  Tell me where you think, if you

2    think, there is fruit of the poisonous tree that I have to

3    follow beyond the particular thing that is at issue either

4    in the circumstances of the statement or the circumstances

5    under which the warrant was obtained.

6              So understanding my expectations in that regard,

7    let me ask defense counsel:  I assume one or more of you is

8    going to order a transcript, right?  So how long of a --

9    well, let me ask the court reporter:  How long of a

10   turnaround are you going to need for a transcript assuming

11   they order it?

12             COURT REPORTER:  I can do the seven days or the

13   14 days.

14             THE COURT:  How many days do you want for the

15   transcript?

16             MR. WOLF:  Judge, I'll put the paperwork in

17   today -- I'm appointed -- to order the transcript.

18             THE COURT:  Okay.

19             MR. WOLF:  Is the reporter saying she will have it

20   in -- Oh.  If I put it in for seven days, it's a higher

21   price.

22             THE COURT:  That's true.

23             MR. WOLF:  I'll try for -- I guess I'm open to

24   when.  I could do seven or 14 days.  It's up to maybe other

25   counsel how much time they want.  I'll probably do 14 days.

1      Give everybody enough time to respond to everything.

2              THE COURT:  If you get 14 days for the transcript,

3      how long do you want after you get the transcript for your

4      briefing?

5              MR. WOLF:  I personally would just need a week.  I

6      can't speak for the others, though.

7              THE COURT:  Does anybody need more than a week for

8      the briefing after receiving the transcript?

9              MR. MORRISON:  No, Your Honor.

10             MS. DURHAM:  No, Your Honor.

11             THE COURT:  All right.  So assuming the paperwork

12     for the transcript is ordered today -- I think that may have

13     to be approved.  So we'll say you've got the transcript most

14     likely by two weeks from tomorrow and then you'll have

15     another seven days beyond that for briefing.  Make sense?

16             Ms. Brennan, how long do you need for response?

17             MS. BRENNAN:  Your Honor, I would ask for two

18     weeks.

19             THE COURT:  So two weeks after you get their

20     briefs?

21             MS. BRENNAN:  Yes, Your Honor.

22             THE COURT:  All right.  I think that's fair.  That

23     will be reflected in the minute entry for this.

24             I will take the nondispositive motions under

25     advisement as of now.  I will take the dispositive motions

1   under advisement once briefing is complete.

2          Ms. Brennan, I have not looked through all of

3   these myself, but I'm going to ask you:  Do you happen to

4   know whether I issued any of these search warrants?

5          MS. BRENNAN:  Yes, Your Honor, I believe that Your

6   Honor issued the search warrant for the Hewlett-Packard

7   computer that was recovered from the Gateway Commons

8   apartment.

9          THE COURT:  So I will need to refer that one to

10  one of the other magistrate judges for a report and

11  recommendation.  If that's the only one that I signed off

12  on, then everything else I will review and prepare a report

13  and recommendation myself, but the one that I signed off on

14  will have to go to another one of the magistrate judges.  I

15  think you can go ahead and file your briefs as you would in

16  any event, but I will take care of getting it in front of

17  one of the other MJs internally.

18         MS. BRENNAN:  And, Your Honor, I believe that that

19  search warrant is at Exhibit -- Government Exhibit Number 8.

20         THE COURT:  All right.  And we'll go through them.

21  If we stumble across another one that I signed, we will

22  follow the same process for that, but it sounds like that

23  there may just be one, remarkably.

24         All right.  Very good.  Anything else we need to

25  attend to this afternoon?

1          MS. BRENNAN:  Not from the government, Your Honor.

2          THE COURT:  On behalf of any of the defendants?

3          MS. DURHAM:  No, Your Honor.  Thank you.

4          MR. MORRISON:  No, Your Honor.

5          MR. LE:  No, Your Honor.

6          MR. WOLF:  Not from Mr. Samaan, Your Honor.  Thank

7     you.

8          THE COURT:  And on behalf of Mr. Kromah, anything

9     further this afternoon?

10          MR. UDOIBOK:  No, Your Honor.

11          THE COURT:  All right.  Thank you.  We'll be in

12     recess.

13          (Court adjourned at 1:54 p.m.)

14                         *     *     *

15

16

17

18          I, Lori A. Simpson, certify that the foregoing is a

19     correct transcript from the record of proceedings in the

20     above-entitled matter.

21

22               Certified by:  *s/ Lori A. Simpson*

23                         Lori A. Simpson, RMR-CRR

24

25